Scileppi, J.
This is a case of first impression which requires that we consider in detail the somewhat amorphous and apparently perplexing concept of de facto appropriation in the hope of clearly defining and firmly establishing its perimeters. Specifically, we have before us the question of whether there can be a de facto taking absent a physical invasion or the imposition of some direct legal restraint. Needless to say, the dictates *248 of precedent, practicality and public policy guide us in seeking a just result.
On or about December 10, 1954, J. W. Clement Company received notice of a hearing to be held in the office of the Buffalo City Clerk on December 21, concerning what has since come to be known as the Buffalo Redevelopment Project. This in turn prompted a request of Clement, directed to the local Chamber of Commerce, that the matter be further investigated. Pursuant to that request, a meeting of the chamber was held at which several city officials, including members of the City Planning Commission and the Commissioner of the Redevelopment Board, spoke, describing the project and advising what properties were to be taken. The record shows that from that time there were frequent meetings, official and otherwise, news releases and advice to owners in the project area indicating when the properties would be appropriated. In August, 1957 the executive secretary of the planning board advised Clement that the taking would be started between 1960 and 1962; and in December, 1957 an Urban Renewal Clinic sponsored by the Buffalo Redevelopment Foundation was held, at which time it was restated that Clement’s property would be taken.
The record further discloses that Clement’s business was and continues to be the printing of national magazines, including Time and Life, as well as paperback books, the latter approximating some one hundred million per annum. Significantly, its printing machines are enormous, requiring, therefore, an appreciable amount of time to prepare for operation and production. Considering both the nature of production and demands of publication, it is readily apparent that, as the Appellate Division found, Clement felt a sense of urgency in ascertaining its status with respect to the project. Apparently, total exclusion was initially sought; and only when those efforts proved futile did Clement undertake a relocation project.
In June, 1960 the secretary of the City Planning Commission informed the company’s president that the premises would have to be vacated within three or possibly four years. By September of that year, the estimate was reduced to within two or three years. Finally, in February, 1961 the Commissioner of the Redevelopment Board advised that all industry would have to vacate within the next 18 to 24 months. Relying on *249 these ‘1 official ’ ’ representations, Clement embarked on its relocation project; and having successfully applied for a building permit in Depew, New York, bought a site for the projected plant. A new press which it had purchased for installation in the subject plant was deferred and redirected for placement in the new plant. On July 18, 1962 the Mayor of Buffalo and the Commissioner of Urban Renewal advised Clement’s president that negotiations for the subject property were scheduled for the following spring.
With appropriation imminent, Clement continued to redirect machinery to the Depew site, then in the final stages of construction. Early in 1963 Clement was advised via letter that acquisition was scheduled for May, 1963. The substance of this correspondence was orally confirmed soon thereafter. Removal was completed by April of that year.
The record, of course, is replete with instances of widespread publicity, including various newspaper reports and the minutes of concerned public agencies, all of which demonstrate what loosely may be termed a pattern of continuous agitation. Additionally, the City Assessor testified that as early as 1959 the city had begun lowering property assessments in the redevelopment area; and, the Department of Buildings had been directed to deny all applications for building permits in the area, issuing perhaps one temporary permit after 1962.
Additional evidence was furnished to show that vacancies were common and that the subject area fell into general disrepair. Indeed, the city’s principal appraisal witness acknowledged that by reason of the threat of condemnation property values were drastically reduced. Defendant Clement’s property was characterized as both unsalable and unrentable after 1963, and all efforts to procure even a short-term tenant proved unsuccessful. Clement, however, as owner in fee, continued to pay taxes and insurance and to maintain the property at its own expense while urging the city to complete the condemnation.
By way of background, Clement has been the owner of the improved parcel which is the subject matter of this proceeding since 1946. Designed as a freight and passenger terminal, the premises had originally been improved, and included certain of the subject buildings since 1929. On taking possession, Clement’s improvements included the addition of a full wing, *250 pouring a new concrete floor, and raising the roof 15 feet for a portion of the middle part of the warehouse. The addition, in 1954, of the west wing indicates that subject premises were fully operational and reflects at least a moderate growth factor. A general corporate history of continued growth and expansion suggests the same conclusion.
Incorporated in 1908, J. W. Clement Company remained a resident of Buffalo until the recent move to Depew. From store front to plant, business growth necessitated the construction of a home plant at Seneca, Lord and Seymour Streets. A pioneer in color printing, increased volume required the purchase of the subject premises. However, within five years of their having added Erie Street to their Lord Street facilities, it became necessary for them to acquire a future plant site in Cheelctowaga in 1951.
As noted above, Clement began moving out of Erie Street in 1962, when it started transferring its operation to a newly constructed plant in Depew, New York. Simultaneously, they also caused the premises at Lord Street (which location is outside the waterfront project limits) to be vacated and also moved to Depew. It is not disputed that the new structure at Depew is a tremendous printing plant, said to be eight times as large as Erie Street and contains 35% more space than the combined locations of Erie and Lord Streets. The Depew plant, which was opened in 1962 was in the planning stage for better than two years, has already been expanded and additional facilities are on the “ drawing boards ”.
It was testified that Clement has become one of the major printers in the world, that the number of employees has approximately doubled since 1945, and an indication of their success is illustrated when reference is had to their Depew plant’s printing seven to eight million copies of Reader’s Digest every month. 'Significantly, testimony was introduced tending to establish that the fact of condemnation was only one of three reasons motivating the move, the other two being the inadequacy of existing facilities. Even at that time, it appeared that, despite the threat of condemnation, Clement would not have to vacate for another five years. It should be noted that-the building permit that was secured in September, 1961 for Depew, evidently was the result of corporate thinking that existed in *251 1960, which was only six years after the addition that had been made at Erie Street in 1954. While affirmed findings of fact preclude the inference that growth considerations were the sole motivation for the move, the above factors demonstrate the probability of a mixed motivation. This of itself warrants more than mere passing consideration, for to expand the current concept of de facto taking on the facts herein may well be to allow all property owners to seek refuge under the broader umbrella of de facto appropriation as soon as the proposed condemnation is announced, irrespective of their underlying motivation; and, perhaps even more importantly, despite the fact that the owner has the right to remain in quiet possession for as many as four or five additional years.
Pursuant to section 555 (subd. 1, par. [a]) of the General Municipal Law, the city commenced a proceeding in accordance with its charter provision (art. 21) to condemn Clement’s waterfront property for redevelopment purposes under its urban renewal plan, denominated Waterfront Development Project No. U. E. N. Y. E-35, and funded in large part by Federal and State grants. After trial, judgment was entered awarding Clement $2,030,306.96, whereupon, pursuant to the City Charter, Clement filed objections to the decision and moved for modification on the grounds that (1) inadequate interest was awarded, and (2) that Clement was not reimbursed for certain moving expenses. In addition, Clement moved, by way of what appears to have been an omnibus motion, for an order assessing* costs and fees, disbursements and expenses incurred in the proceeding. Separate orders denying both motions were entered on January 22,1969, whereupon Clement prosecuted three separate appeals to the Appellate Division, Fourth Department: from the judgment itself and from the separate orders denying the respective motions for modification and the assessment of costs. The city cross appealed from “ each and every part of said judgment as well as from the whole thereof.”
On appeal the Appellate Division modified, on the law and the facts, and affirmed as so modified, ordering that (1) the award for removing defendant’s machinery be increased from $785,000 to $869,819.20; (2) that the sum of $84,000 allowed for machinery left on the premises be deleted; (3) that interest on the modified award run at the rate of 4% from April 1, 1963 to August 1, *252 1966 and thereafter at the rate of 6%. As to the separate orders of the Supreme Court, the Appellate Division (1) modified by reversing those parts which denied statutory costs and disbursements and an extra allowance to Clement, and consistent with the above modification of the judgment, (2) modified the second order to provide for the increase in the award for removal and interest rates respectively. Both parties prosecute these cross appeals from the judgment entered after separate orders of the Appellate Division[1].
The trial court found that the acts of the city, including its protracted delay, had ‘ ‘ destroyed the value of the property to the defendant and made the property no longer fit to be used as the defendant had been using it and had planned to use it in the future.” In addition, it found that the city, by its threat of condemnation, had forced the Clement Company to move its business operation and that in view of the nature of its business Clement ‘ ‘ waited to do this until, the last possible moment that a prudent businessman could wait.” On the basis of these findings, the trial court held that there was a de facto taking of Clement’s property as of April 1, 1963 and that its value should be determined as of the year 1962. This holding was affirmed by the Appellate Division, reasoning that there was “a de facto taking * * * inasmuch as the city’s acts forced Clement to move from its property * * * rendering the property not only unsalable but unrentable and yielding no income whatever.” (34 A D 2d 31-32.)
Preliminarily, it is well to note that our consideration of the problem posed by the present appeal is, of course, guided by constitutional guarantees. Both the Federal and State Constitutions provide in sum, that private property shall not be taken for public use without just compensation. This, of course, marks only the beginning of the inquiry, as the nicer questions relating to precisely what constitutes a taking, as well as *253 just compensation in the constitutional sense remain to be determined.
Although the condemning authority is generally not liable to a condemnee until title to the property is officially taken (Condemnation Law, § 4; Court of Claims Act, § 10; 17 CarmodyWait 2d New York Practice, § 108.19; 19 N. Y. Jur., Eminent Domain, §§ 78-79), it has long been recognized by the courts of this State that the constitutional provision against the taking of property without just compensation may be violated without a physical taking. Indeed, injuries which in effect deprive individuals of full or unimpaired use of their property may constitute a taking in the constitutional sense (29A C. J. S., Eminent Domain, § 110; see, also, Leeds v. State of New York, 20 N Y 2d 701; Matter of Keystone Assoc. v. Moerdler, 19 N Y 2d 78; Oswego & Syracuse R. R. Co. v. State of New York, 226 N. Y. 351; Forster v. Scott, 136 N. Y. 577; Lambert v. State of New York, 30 A D 2d 582; American Woolen Co. v. State of New York, 195 App. Div. 698, 704). Thus, we held in Forster v. Scott (136 N. Y. 577, supra) that whenever a law deprives the owner of the beneficial use and free enjoyment of his property, or imposes restraints upon such use and enjoyment that materially affect its value, it deprives him of his property within the meaning of the Constitution. And it is not necessary, in order to render a statute obnoxious to the restraints of the Constitution, that it must in terms or in effect authorize an actual physical taking of the property, so long as it affects its free use and enjoyment or the power of disposition at will of the owner. These words are pervasive and would at first blush require affirmance herein. However, the concept of de facto taking has traditionally been limited to situations involving a direct invasion of the condemnee’s property or a direct legal restraint on its use (Leeds v. State of New York, 20 N Y 2d 701, supra; Matter of Keystone Assoc. v. Moerdler, 19 N Y 2d 78, supra; Oswego & Syracuse R. R. Co. v. State of New York, 226 N. Y. 351, supra; Forster v. Scott, 136 N. Y. 577, supra), and to hold that there can be a de facto appropriation absent a physical invasion or direct legal restraint would, needless to say, be to do violence to a workable rule of law. It is our view that only the most obvious injustice compels such a result. The Appellate Division, discerning so substantial an interference *254 with the use of the subject property, found the essential elements of ownership to have been destroyed and held that the city’s action constituted a de facto taking. We firmly disagree with that determination.
There is in fact a marked distinction between those cases which by reason of the cloud of condemnation, resulting in so-called condemnation blight, permit the claimant to establish his true value at the time of the taking but as if it had not been subjected to the debilitating effect of the threat of condemnation (Niagara Frontier Bldg. Corp: v. State of New York, 33 A D 2d 130, affd. 28 N Y 2d 755, decided herewith), and those cases which go even further and declare that the acts of the condemnor constitute a de facto taking long before the filing of appropriation maps (Matter of Keystone Assoc. v. Moerdler, 19 N Y 2d 78, supra; Forster v. Scott, 136 N. Y. 577, supra). One is the product of acts which result, realistically speaking, in no less than an out and out appropriation of property, requiring in turn that the owner be fully compensated, while the other relates more properly to certain affirmative value-depressing acts on the part of the condemning authority, requiring only that evidence be received of value prior to such acts in an effort to arrive at just compensation. Both concepts owe their existence to the law’s efforts to secure full compensation; they differ only insofar as one involves essentially the rules of appropriation while the other relates to the rules of evidence.
Nor, as the present appeal clearly suggests, is the distinction merely academic. Clearly, both the award itself and the award as increased by the interest allowance are directly proportionate to the time of the taking and to hold that the taking was complete at an earlier date would, of necessity, require that interest run from that date; surely, no incidental matter, as it presently involves some $459,603.86.[2] The distinction has, however, at times been ignored and lower courts have been wont *255 to confuse the concepts, often speaking of one in terms of the other (see, e.g., City of Buffalo v. Irish Paper Co., 31 A D 2d 470, 475-476).
Despite this obvious confusion, it is clear that a de facto taking requires a physical entry by the condemnor, a physical ouster of the owner, a legal interference with the physical use, possession or enjoyment of the property or a legal interference with the owner’s power of disposition of the property. On the other hand, ‘ ‘ condemnation blight” relates to the impact of certain acts upon the value of the subject property. It in no way imports a taking in the constitutional sense, but merely permits of a more realistic valuation of the condemned property in the subsequent de jure proceeding. In such a case, compensation shall be based on the value of the property at the time of the taking, as if it had not been subjected to the debilitating effect of a threatened condemnation.
The facts herein fail to disclose any act upon the part of the condemning authority which could possibly be construed as an assertion of dominion and control. Indeed, it cannot be said that the city, by its actions, either directly or indirectly deprived Clement of its possession, enjoyment or use of the subject property. We simply have a manifestation of an intent to condemn and such, even considering the protracted delay attending final appropriation, cannot cast the municipality in liability upon the theory of a “ taking ” for there was no appropriation of the property in its accepted legal sense. As the Supreme Court has held: “ A reduction or increase in the value of property may occur by reason of legislation for or the beginning or completion of a project. Such changes in value are incidents of ownership. They cannot be considered as a ‘ taking ’ in the constitutional sense ” (Danforth v. United States, 308 U. S. 271, 285). This reasoning, it may be added, has been applied time and time again to deny compensation based upon the asserted theory that the threat of condemnation constitutes an actual taking (see, e.g., Matter of City of New York [BostonSecor Houses—Rusciano], 28 A D 2d 658; Housing Auth. of City of Decatur v. Schroeder, 222 Ga. 417; Town of Swampscott v. Remis, 350 Mass. 523; St. Louis Housing Auth. v. Barnes, 375 S. W. 2d 144, 146-148, [Mo.]; City of Houston v. Biggers, 380 S. W. 2d 700, 704-705, [Tex.]; Bakken v. State Highway Comm., *256 142 Mont. 166; Chicago Housing Auth. v. Lamar, 21 Ill. 2d 362; Sorbino v. City of New Brunswick, 43 N. J. Super. 554; A. Gettleman Brewing Co. v. City of Milwaukee, 245 Wis. 9; State ex rel. City of St. Louis v. Beck, 333 Mo. 1118), and the rule has evolved in this State denying direct recovery for the manifestation of an intent to take (Waller v. State of New York, 144 N. Y. 579, 599) or threat to condemn (2 Nichols, Eminent Domain [3d ed.], § 6.1, subd. [1]).
Moreover, strong public policy considerations prohibit a finding of a de facto taking in the instant case. To hold the date of the announcement of the impending condemnation, whether directly to the condemnee or by the news media, constitutes a de facto taking at that time, would be to impose an ‘ ‘ oppressive ’ ’ and “ unwarranted ” burden upon the condemning authority. At the very least, it would serve to penalize the condemnor for providing appropriate advance notice to a property owner. And to so impede the actions of the municipality in preparing and publicizing plans for the good of the community, would be to encourage a converse policy of secrecy which “ would but raise [greater] havoc with an owner’s rights ” (City of Buffalo v. Clement Co., 34 A D 2d 24, 39 [dissenting opn.]).
Again, although we have not yet arrived at a point where an expression of an intent to appropriate, absent some act on the part of the condemning authority toward executing the appropriation (for example, taking possession or exercising some form of control over the use or enjoyment of the property), that is not to say that interferences short of physical invasion of the condemnee’s property may not be sufficient to constitute a taking, as it has long been settled that a de fado taking does occur where the property has been the subject of some direct legal restraint on its use (supra). As noted above, direct legal restraint has traditionally embraced only laws which by their own force and effect, deprive owners of property or materially affect its beneficial use and free enjoyment (see, e.g., Matter of Keystone Assoc. v. Moerdler, 19 N Y 2d 78, supra; Forster v. Scott, 136 N. Y. 577, supra). While there is authority supportive of the proposition that in the absence of such a law de facto taking does not occur without either actual physi *257 cal invasion or ouster of possession (Cicci v. State of New York, 31 A D 2d 733), the idea that there can he a de facto taking in the absence of a physical invasion or direct legal restraint is not without current support and finds some viability in the decisions of sister. States and the broader pronouncements of other courts (see, e.g., City of Detroit v. Cassese, 376 Mich. 311; Foster v. City of Detroit, 254 F. Supp. 655, affd. on other grounds, 405 F. 2d 138, 147).
Despite these divergent lines of authority, the policy of this State has been to deny recovery in the absence of a substantial impairment of the claimant’s right to use or enjoy the property at any time prior to the date of final appropriation. Accordingly, the mere announcement of impending condemnations, coupled as it may well be with substantial delay and damage, does not, in the absence of other acts which may be translated into an exercise of dominion and control by the condemning authority, constitute a taking so as to warrant awarding compensation.
Nor can we agree with the Appellate Division’s emphasis upon the fact that there were a number of meetings with city officials regarding the impending condemnation. It is important to note that the city never, by its statements or actions, directly or indirectly, interfered or sought to exercise any control over the property, thus inferentially depriving the claimant of its possession, enjoyment or use. Neither can we agree with the majority below that the acts of the city, “ so interfered with the use of the subject property that essential elements of ownership have been destroyed” (34 A D 2d 32). There is nothing in the record that indicates any element of ownership was destroyed by an act of the city on April 1,1963.
In sum, therefore, there was no appropriation which would permit an award of damages prior to the de jure taking. This, however, is not to say that the aggrieved property owner is without remedy. Indeed, the aggrieved property owner has a remedy where it would suffer severely diminished compensation because of acts by the condemning authority decreasing the value of the property (Niagara Frontier Bldg. Corp. v. State of New York, 33 A D 2d 130, affd. 28 N Y 2d 755, decided herewith). In such cases where true condemnation blight is *258 present, the claimant may introduce evidence of value prior to the onslaught of the “ affirmative value-depressing acts ” (City of Buffalo v. Irish Paper Co., 31 A D 2d 470, 476) of the authority and compensation shall he based on the value of the.property as it would have been at the time of the de jure taking, but for the debilitating threat of condemnation (see, also, City of Detroit v. Cassese, 376 Mich. 311, 317-318, supra; City of Cleveland v. Carcione, 118 Ohio App. 525; 4 Nichols, Eminent Domain [3d ed.], § 12.3151; Owen, Recovery for Enhancement and Blight in California, 20 Hastings L. J. [Univ. of Cal.] 622, 643-649 [Jan., 1969]). This, in turn, requires only that there be present some proof of affirmative acts causing a decrease in value and difficulty in arriving at a value using traditional methods (City of Buffalo v. Irish Paper Co., 31 A D 2d 470; affd. 26 N Y 2d 869, supra).
Thus, when damages are assessed on the claim for the de jure appropriation, the claimant’s property should be evaluated not on its diminished worth caused by the condemnor’s action, but on its value except for such “ affirmative value-depressing acts ’ ’ of the appropriating sovereign. This, it appears, would provide adequate and just compensation. As the defendant offered no evidence of value in 1968 based upon market data nor did the city offer any valid appraisal evidence, we lack competent evidence upon which an award could be fashioned. Accordingly, a new trial is required; at which evidence of proper valuation could be taken.
DAMAGES
The constitutional requirement of just compensation requires that the property owner be indemnified so that he may be put in the same relative position, insofar as this is possible, as if the taking had not occurred (Rose v. State of New York, 24 N Y 2d 80, 87; Marraro v. State of New York, 12 N Y 2d 285, 292-293; Banner Milling Co. v. State of New York, 240 N. Y. 533; Matter of Board of Water Supply of N. Y., 277 N. Y. 452; New York, Ontario & Western Ry. Assoc. Co. v. Livingston, 238 N. Y. 300). An appropriation of land by the State, therefore, unless qualified when made, is an appropriation of all that is annexed to the land, whether classified as buildings or as fixtures, and the value of the fixtures must be included in determining the *259 total value of the property so appropriated (Marraro v. State of New York, 12 N Y 2d 285, 292, supra; Jackson v. State of New York, 213 N. Y. 34). They are part of the realty so long as they remain fixtures (Matter of Willcox, 165 App. Div. 197, 200). Mere personalty, on the other hand, although used in conjunction with realty is not compensable (cf. Madfes v. Beverly Development Corp., 251 N. Y. 12; Stahl v. Norwich, 204 App. Div. 552; see, also, Marraro v. State of New York, 12 N Y 2d 285, 292, supra) and personalty which has lost its identity as such by becoming a structural part of a building can no longer become the subject of a separate award (Marraro v. State of New York, 12 N Y 2d 285, 292, supra, citing Matter of City of New York [Delancey St.], 120 App. Div. 700; see, also, Great A. & P. Tea Go. v. State of New York, 22 N Y 2d 75).
Of course, fixtures are often severed from the subject property and used profitably elsewhere. Cognizant of the realities of modern business practice and in deference to our obligation to insure that compensation be just, in terms of both the particular property holder and the public at large, we have forged a rule of valuing fixtures which are removed or capable of being removed. The accepted method of valuing such fixtures is to determine the difference between salvage value of the item and present value in place (i.e., reproduction cost less depreciation). As we noted in Rose v. State of New York: “ This method, though it employs the label salvage, does not indicate that the item can only be used for scrap purposes, but the valuation method takes into account the use of the machine in a definable second-hand market for used industrial machinery. Thus, when a claimant removes his fixtures to a new location, they are not always properly valued by reference to a secondhand market in industrial equipment. The machinery, if removed or if it could be successfully removed, should be also valued by determining either the actual or contemplated costs of disassembling, trucking and reassembling the item at a new location. If the cost of removal is less than the difference between salvage value and present value in place, this is all the claimant is entitled to recover. The State is not required to place a claimant in a better position than he was before the taking by helping him to finance a new facility.” (24 N Y 2d 80, 88.)
*260 The trial court found that the machinery installed in the building was an integral part of the going business or the premises and as such constituted fixtures for which compensation must be awarded (Rose v. State of New York, 24 N Y 2d 80, supra; Matter of City of New York [Allen St.], 256 N. Y. 236; Matter of City of New York [Maxwell], 15 A D 2d 153, 175, affd. sub nom. Matter of City of New York [Lincoln Sq. Slum Clearance Project], 12 N Y 2d 1086). Since the machinery was movable, and the cost of moving it ($869,819.20) was far less than its value in place ($4,478,000) less the resale or salvage value ($509,250) the city need only pay the moving costs (Rose v. State of New York, 24 N Y 2d 80, 88, supra). Although the city offered no evidence to the contrary, the trial court awarded Clement only $785,000 therefor. The Appellate Division modified and awarded Clement the sum of $869,819.20 for its moving expenses. The city now argues that the order of the Appellate Division awarding Clement $869,819.20 as moving expenses was erroneous as a matter of law. Presented with the fact that there was no de facto taking as of April, 1963, that position, at least by traditional standards, is not without some merit.
The question of whether an item is to be considered personalty or treated as a fixture is properly determined by reference to the time of the taking (Wolfe v. State of New York, 22 N Y 2d 292; Kahlen v. State of New York, 223 N. Y. 383; Matter of Board of Water Supply of N. Y., 277 N. Y. 452, supra).‘ A time comes when the right to compensation is fixed. That time is when the taking or appropriation is complete ” (Kahlen v. State of New York, 223 N. Y. 383, 390, supra, citing Chicago, M. & St. P. R. R. Co. v. Wisconsin, 238 U. S. 491, 500). Invocation of that rule would obviously bar recovery in the present case, as what were once in fact fixtures, having already been removed to the Depew facilities, were no longer part of the subject premises at the time of the proceedings. The city, it may be argued, was, therefore, under no obligation to compensate for their removal (Great A. & P. Tea Co. v. State of New York, 22 N Y 2d 75, supra, citing Gurwitz v. State of New York, 27 Misc 2d 731, affd. 15 A D 2d 712, affd. sub nom. Marraro v. State of New York, 12 N Y 2d 286, supra; Matter of City of New York [Triborough Bridge], 159 Misc. 617, affd. 257 App. Div. 940, mot. for lv. to app. den. 282 N. Y. 808).
*261 Just compensation, however, “ is properly measured by ” assessing the actual loss to the owner of the subject premises (Rose v. State of New York, 24 N Y 2d 80, 87, supra, citing St. Agnes Cemetery v. State of New York, 3 N Y 2d 37, 43). And, as the State is not required to place a claimant in a better position than he was prior to the taking, we have established a rule of damages which limits compensation to either in-place value or removal costs, whichever is less (see Rose v. State of New York, 24 N Y 2d 80, 88, supra). That rule imposes upon the condemnee the obligation of mitigating damages or suffering the consequences of his failure to do so, and his efforts to redress his damages by removing the fixtures to a new location, under the circumstances, should not work to deprive him of his right to be made whole. Indeed, where the law encourages the condemnee to mitigate, it would be particularly unjust to allow the condemning authority, whose representations are the immediate cause of the removal, to rely upon the fact of prior removal as a basis for arguing that the property was only personalty at the time of the taking and thus noncompensable.
On a parity of reasoning, to hold that because of the prior removal Clement may not recover any amount would be to ignore the actions of the city at whose behest the machinery was prematurely removed. Although Clement, by transferring the property to the Depew facilities has clearly retained the use thereof, it nevertheless did incur an extraordinary expense and just compensation requires that the city, on these facts, pay the reasonable costs of removing (Rose v. State of New York, 24 N Y 2d 80, 88, supra). As the city offered no contrary evidence of the moving costs, we agree with the Appellate Division that the award should be increased to $869,819.20.
The question of whether the Appellate Division erred in striking the separate award for $84,000 for machinery which could not economically be removed, however, requires independent consideration. Relying on the authority of Great A. & P. Tea Co. v. State of New York (22 N. Y 2d 75, supra), the Appellate Division held that in light of Clement’s prior removal of all other machinery it is reasonable to assume that these items were not removable without substantially damaging the freehold and thus could not be the subject of a separate award for fixtures. The reliance is in the final analysis mis *262 placed. Firstly, to hold that certain machinery is not compensable by way of a separate award is not to say, as the Appellate Division apparently concluded by neglecting to increase the realty award (by either ‘ ‘ in place value ” or by “ moving costs ”, whichever under Rose v. State of New York, supra, would apply), that it is not compensable at all. Indeed, as noted above, the concept of full compensation requires that an appropriation of land by the condemning authority, unless qualified when made, be deemed an appropriation of all that is annexed to the land, whether classified as buildings or as fixtures, and the value of fixtures be included in determining the total value of the property so appropriated (supra, pp. 259-260 and citations therein). Seasoning as it did, the inference is irresistible that the Appellate Division found that the machinery was so affixed to the realty as to constitute a part thereof. As such it was error for the court to strike the separate award without simultaneously making some provision for its value in the realty award[3].
Moreover, the rule enunciated in Great A. & P. Tea Co. v. State of New York (supra) is not so pervasive and may well be limited to those peculiar facts. This is not to say that such facts are sui generis, but merely warns against too facile an invocation of an admittedly harsh rule. Factors such as the nature of the items and their mode of installation are certainly germane in determining whether they are so affixed as to become an integral part of the realty. The facts of the present case are equally consistent with the theory that economic considerations prohibited their removal.
COSTS AND FEES
Finally, Clement appeals from so much of the judgment as (I) limits the rates of interest on the award to 4% from April 1, 1963 to August 1, 1966 and to 6% thereafter; and (2) denies payment of counsel fees and other expenses paid or incurred in the course of these proceedings.
As to the denial of counsel fees, we agree with the courts below that these expenses are merely incidents of litigation and thus are not compensable in the absence of statutory *263 authority providing for such (Matter of Low, 208 N. Y. 25, 31; Matter of City of Brooklyn, 148 N. Y. 107; Matter of School St., 162 App. Div. 158). Similarly, the Appellate Division was correct in reversing the order of the trial court which denied, as a matter of law, statutory costs and disbursements to the defendant simply because the City Charter makes no provision therefor. The lack of provision for costs in a city charter surely seems a poor ground for denying costs to a defendant. On such basis, a municipality could insulate itself from payment of costs in any action. CPLB 8101 provides generally that, ‘ ‘ The party in whose favor a judgment is entered is entitled to costs in the action, unless otherwise provided by statute or unless the court determines that to so allow costs would not be equitable, under all of the circumstances.” CPLB 103 (subd. [b]) and CPLB 105 (subd. [b]) make such provision applicable to a special proceeding, which this is. As the successful party in this proceeding, there seems no good reason for denying costs to the defendant; and so statutory costs should have been awarded (City of Buffalo v. Irish Paper Co., 31 A D 2d 470, affd. 26 N Y 2d 869, supra; Matter of Low, 208 N. Y. 25, 31, supra; Matter of City of Brooklyn 148 N. Y. 107, supra; Matter of School St., 162 App. Div. 158, supra).
The question of additional costs presents a more difficult question and we agree with the trial court’s decision that it lacked the authority to grant an additional allowance pursuant to section 16 of the Condemnation Law.
That provision, applicable to all condemnation proceedings under the Condemnation Law, directs, in the discretion of the trial court, the payment of an extra allowance for costs, not to exceed 5% upon the amount awarded, where the compensation awarded exceeds the amount of the condemnor’s initial offer. The present proceeding was, in accordance with section 555 of the General Municipal Law providing that for the purposes of urban renewal, property “ may be acquired * * * pursuant to the condemnation law or pursuant to the laws relating to the condemnation of land by the municipality ’ ’, brought under article 21 of the Buffalo City Charter. The charter itself is silent on the matter of additional allowances. As the statutory schemes are mutually exclusive (indeed, sec *264 tion 27 of the Condemnation Law itself provides for the continued viability of city charters in such matters), there is no reason why the provision for extra allowances must be incorporated into local charters. Stated simply, both the Condemnation Law and the City Charter relate to condemnation proceedings ; each, however, is complete in itself and prescribes a system of procedure, each for itself (City of Buffalo v. Irish Paper Co., 31 A D 2d 470, affd. 26 N Y 2d 869, supra).
Nor, as the Appellate Division held and as the defendant argues here, is the charter’s denial of an additional allowance violative of the equal protection clause. While it is true that the Condemnation Law does authorize the assessment of an extra allowance for costs, we perceive no constitutional requirement that a similar allowance be so provided by the City Charter. The situation is clearly distinguishable from one where the State Legislature arbitrarily provides for different treatment between the State and a municipality in matters pertaining to “fair compensation” (Matter of City of New York [Wembley Realty Corp.], 32 A D 2d 526). Indeed, unlike the question of interest (see infra) the assessment of costs, in this instance additional costs, does not relate to fair compensation, which constitutionally must be set at uniform rates: fair compensation is fair compensation, regardless of the nature of the condemning authority. While it may be argued that the Legislature should make provision for such allowances, we do not think that its failure to do so involves a violation of the Constitution (Matter of Low, 208 N. Y. 25, supra; Matter of City of Brooklyn, 148 N. Y. 107, supra). Compensation, therefore, for such costs, to the extent that it is currently assessable, must be had under the general provisions of the CPLE, allowing for such in extraordinary or difficult cases.
The Appellate Divilsion, remanding for the assessment of additional costs under section 16 of the Condemnation Law, in terms affirmed the trial court’s denial of Clement’s request for further allowance under CPLE 8303 (subd. [a], par. 2). That section provides in substance that the trial court, in a difficult or extraordinary case may, on motion and in the exercise of its discretion award a sum not exceeding 5% of the amount awarded, or $3,000, whichever is less, to any party *265 to the proceeding (CPLR 8303, subd. [a], par. 2). Our denial of additional costs under section 16 and our reasoning regarding the assessment of statutory costs and disbursements under the CPLR (supra) requires that the matter be remanded to the trial court for a determination of whether, in view of the complexities of the issues raised, Clement should be awarded extra allowances under CPLR 8303 (subd. [a], par. 2).
INTEREST
The trial court awarded interest at the rate of 4% per annum. The Appellate Division modified that award by increasing the rate from 4% to 6% after August 1, 1966. The basis for so holding was that effective August 1, 1966 the interest rate in State condemnation cases was increased from 4% to 6% (State Finance Law, § 16). The court, viewing the increase as a legislative declaration of a fair present rate, found a denial of equal protection of law insofar as section 3-a (subd. 2) of the General Municipal Law limited payment of 6% to State condemnees after August 1, 1966 while allowing muncipal condemnees a mere 4%. In a lengthy argument Clement Company contends that both the 4% and 6% rates awarded by the Appellate Division fall far short of just compensation. We firmly disagree and affirm the reasoning of the Appellate Division on the basis of Matter of City of New York [Manhattan Civic Center Area—Boehm—Reade Corp.] (32 A D 2d 530, affd. 27 N Y 2d 518) and Matter of City of New York [Wembley Realty Corp.] (32 A D 2d 526, supra, affd. 27 N Y 2d 518), both of which are dispositive here. As there was no taking in April, 1963 the judgment should be so modified as to delete therefrom the provision awarding interest at a rate of 4% for the period of April 1, 1963 to August 1, 1966 and to provide for an award of 6% interest only from the time of payment of the award or entry, whichever occurs first (Buffalo City Charter, § 388).
Reduced to its simplest form, Clement’s arguments regarding the rate of interest awarded relate solely to the question of just compensation. This question has only recently been considered by this court in Matter of City of New York [Manhattan Civic Center Area] (32 A D 2d 530, affd. 27 N Y 2d 518, supra) and Matter of City of New York [Wembley Realty Corp.] (32 AD 2d 526, affd. 27 N Y 2d 518, supra) and held to be without merit.
*266 We have held that compensation when not paid coincidentally with the taking of property, must include some sum in addition to the bare value of the property at the date of taking for any delay in making payment, so that compensation may be just. Without the addition of some sum, the requirement of just compensation constitutionally guaranteed, would not be met (Jacobs v. United States, 290 U. S. 13; Phelps v. United States, 274 U. S. 341; Matter of City of New York [Bronx Riv. Parkway], 284 N. Y. 48, 54-55, affd. 313 U. S. 540). The determination of the proper rate of interest, however, being a part of just compensation, is necessarily a judicial function which the Legislature may' not usurp (Jacobs v. United States, 290 U. S. 13, supra; Seaboard Air Line Ry. Co. v. United States, 261 U. S. 299). This is not to say that the statutory provision for the payment of interest is without efficacy, for we have consistently viewed the statutory rate as presumptively reasonable, and in the absence of evidence sufficient to rebut that presumption capable of being applied the legal rate of interest merely fixes a fair measure or a prima facie measure of the proper rate to afford just compensation. In the absence of proof that some other legal rate must be paid to afford such compensation, the legal rate as it existed during the period elapsed satisfies the constitutional requirement. The question thus becomes whether the evidence introduced by Clement in the instant case is sufficient to rebut the statutory presumption; and as we are presented with affirmed findings of fact, tending to show that the rate of interest was not unreasonable, and as these findings are supported by substantial evidence, we are jurisdictionally precluded from reviewing the same (Cohen and Karger, Powers of the New York Court of Appeals, pp. 476-480). Accordingly, the interest rate of 6% provides adequate and just compensation.
The judgment appealed from should be modified, without costs, to the extent indicated herein, and the cause remanded for a new trial on the question of proper valuation and for findings consistent with this opinion.
Chief Judge Fuld and Judges Bergan, Breitel, Jasen and Gibson concur; Judge Burke taking no part.
Judgment accordingly.

. It is to be noted that the Appellate Division in ordering a modification of the judgment of the Supreme Court remitted the ease to that court for a hearing and determination of issues with respect to (1) an extra allowance, (2) costs and (3) disbursements. This remission rendered the Appellate Division’s determination nonfinal and resulted in a dismissal of prior appeals (City of Buffalo v. Clement Co., 27 N Y 2d 794; Cohen and Karger, Powers of the New York Court of Appeals, pp. 43, 47, 57-58).

. While neither factor is dispositive, each is certainly germane. As was stated by Judge Cardozo in New York, Ontario & Western By. Co. v. Livingston (238 N. Y. 300, 306): “‘It is the duty of the State, in the conduct of the inquest by which compensation is ascertained, to see that it is just, not merely to the individual whose property is taken, but to the public which is to pay for it.”’

. “ Whatever is land within the general and legal meaning of the term, is to be estimated in ascertaining the compensation.” (Schuchardt v. Mayor of City of N. Y., 53 N. Y. 202, 208.