OPINION OF THE COURT
Edwin Margolis, J.
This is a claim for damages resulting from the appropria *774 tian of trade fixtures owned by claimants and located on rented premises in the City of Utica, Oneida County. Such premises were appropriated in a proceeding entitled "Interstate 790 (Oriskany Circle Connections) Oneida County” pursuant to section 30 of the Highway Law and the Eminent Domain Procedure Law. Maps describing the appropriated parcels were recorded in the Oneida County Clerk’s office.[1] Said maps and the descriptions set forth thereon are adopted by the court and incorporated herein by reference. The parties stipulated that the date of taking was July 25, 1986, and the court so finds. The court viewed the trade fixtures in place on the appropriated parcels in company with Judge Louis C. Benza of this court, who was the IAS Judge at the time. Subsequently, this claim was transferred to the undersigned.
Claimants had operated a scrapyard and metal recycling plant on 1.807 acres which they leased from Harris G. Nathan, Norman Nathan and David H. Nathan and on 4.277 contiguous acres they subleased from the New York, Susquehanna and Western Railway Corp. Previously, the Nathans had operated this scrapyard and recycling plant, but in December 1980 claimants purchased the business from the Nathans, buying the trade fixtures and personal property and leasing the real property.
This lawsuit is to determine the value of six trade fixtures owned by claimants and attached to and not removed from the rented premises. The logemann briquetter and the truck scale and pit were located on the Nathan property and the four other trade fixtures on the railroad property. Although not testified to at trial, claimants’ filed appraisal also asserts claims for such items as site preparation and placing a fence around the entire premises, railroad tracks and roadbeds. Such claims, since they do not specifically relate to the trade fixtures but to the parcel as a whole, are more properly reflected in the valuations of the two fees. Since, by the terms of the leases, claimants have no interest in the fee condemnation award, these claims are disallowed.[2]
*775 Even though a lease provision stating that no part of a condemnation award belongs to the tenant precludes the tenant’s recovery for the value of the leasehold which was appropriated, it does not preclude a claim for the loss of the tenant’s trade fixtures. (Matter of City of New York [Glantz], 55 NY2d 345, 351; Gristede Bros. v State of New York, 11 AD2d 580; 2 Nichols, Eminent Domain § 5.47 [2] [3d rev ed].) The general rule is that a tenant is entitled to compensation for trade fixtures placed upon the premises by him. (City of Buffalo v Michael, 16 NY2d 88.) The court finds that the six trade fixtures in place are unique items. For example, the D & J Press weighs 285,000 pounds and requires a specially designed foundation and building to house it.
Since a trade fixture in place consists of the functioning trade fixture, the specialty building or shell which houses the fixture, required ancillary equipment, installation and the particular real property to which it is affixed, a realistic market for such fixtures does not exist and, consequently, market value cannot be found or does not result in the owner receiving his constitutional just compensation. Accordingly, courts and commentators have held that such special purpose properties cannot be valued by the market value approach and, therefore, the constitutional standard of "[j]ust compensation is properly measured by determining what the owner has lost (St. Agnes Cemetery v. State of New York, 3 N Y 2d 37, 43).” (Rose v State of New York, 24 NY2d 80, 87; see generally, 4 Nichols, Eminent Domain § 12C.01 [2] [3d rev ed].) The rule in New York is that the proper method of valuing trade fixtures in place is by determining their sound value (City of Buffalo v Clement Co., 28 NY2d 241, 261-262), and the sound value of a trade fixture in place is measured by the reproduction cost of the fixture less depreciation (Marraro v State of New York, 12 NY2d 285, 296, affg 15 AD2d 707).
All expenditures that reasonably and necessarily are to be expected in the recreation of the fixture must be included as elements of reproduction cost. Costs of required ancillary equipment, foundations, buildings, installation and other ingredients which go directly into the creation of the fixture in place must also be included. (See, Matter of City of New York [Salvation Army], 43 NY2d 512; Marraro v State of New York, 15 AD2d 707, affd 12 NY2d 285, supra.) After determination *776 of the reproduction cost of the fixture on the date of the appraisal, the accrued depreciation of the fixture must be deducted from such reproduction cost. (Matter of City of New York [Salvation Army], 43 NY2d 512, supra.) Accrued depreciation is loss in value from reproduction cost due to physical deterioration, functional obsolescence, and external obsolescence. It may be estimated by applying the ratio of a fixture’s effective age to its total economic life to the current reproduction cost. (See generally, American Inst of Real Estate Appraisers, Appraisal of Real Estate, ch 17 [9th ed 1987].) A deduction for functional obsolescence is not warranted if the taken facility is capable of profitable operation and, consequently, is not established where there is no proof that the facility was not operated profitably. (See, Barber & Bennett v State of New York, 34 AD2d 303, 305; Matter of City of New York [Ruppert Brewery Urban Renewal Project] 67 Misc 2d 863, 869.)
All parties agree that the subjects of this claim are trade fixtures in place and, thus, they must be valued by determining their sound value (reproduction cost new less accrued depreciation). Although there are some questions with regard to the reproduction cost (new) of the various fixtures, the most significant point of dispute is the amount of depreciation to be deducted. This dispute ultimately involves four independent appraisers plus appraisal personnel employed by the New York State Department of Transportation (DOT). DOT first commissioned two appraisal reports of the value of the subject fixtures for the purpose of obtaining Federal highway funding. These appraisals were ordered from D & J Press Co. (D & J) and T.O. Prossner (Prossner), consulting engineer. The D & J Press Co. is a leading manufacturer of baling presses and in fact was the manufacturer of the largest baling press on the premises. Both D & J and Prossner made accrued depreciation appraisals averaging in the vicinity of 50%. (Precise percentages will be set forth later in this decision.)
As previously stated, claimants had purchased the fixtures from the Nathans. A memorandum, not the bill of sale, prepared by the Nathans’ attorney in connection with the sale transaction indicated values of the fixtures of approximately 5 to 15% of the D & J and Prossner appraisals. These values were adopted by claimants in a filed Federal income tax return related to a subsequent sale between claimants. For these reasons, and also because DOT officials erroneously believed that the scrapyard and recycling plant was out of *777 business prior to the taking,[3] DOT retained William D. Kovalesky of Enterprise Appraisal Co. (Enterprise) to critique the D & J and Prossner appraisals. Employing methodology to be discussed below, Enterprise reported that the D & J and Prossner appraisals significantly underreported the amount of depreciation and that the true accrued depreciation of these fixtures was between 87 and 96%. As might be expected, DOT discarded the D & J and Prossner appraisals and instead retained Enterprise Appraisal Co. to prepare a new appraisal to be filed with the court.
As a consequence, the two appraisals formally filed with the court were those of Eugene H. Koenig, claimants’ appraiser, and Enterprise Appraisal Co., defendant’s appraiser. Prior to trial, however, claimants moved to require the State to produce the D & J and Prossner appraisals. The court granted the motion and claimants were provided with copies. Such appraisals were subsequently admitted into evidence at trial on the authority of Nunes v State of New York (59 NY2d 745) and were fully considered together with the filed appraisals in arriving at claimants’ damages, especially in resolving the significant differences between the Koenig and Enterprise appraisals. However, the Prossner appraisal was not given much weight because its conclusions were not backed by detailed supporting materials in the same manner as the other three appraisals.
The court is of the opinion that the D & J Press Co. is the most experienced and competent appraiser of the four with respect to estimating depreciation of these fixtures. D & J is the company which actually manufactures, repairs and maintains many of these types of fixtures. It estimated, based upon its vast empirical experience in general and after inspecting these fixtures in particular, the total economic life of each unit, as well as its effective age. It appears to the court that D & J based its estimate of total accrued depreciation on the actual observed condition of the fixtures and their anticipated total economic life, not on any abstract accounting or tax schedules. On the other hand, Jack C. Emery, president of Enterprise, was very emphatic in stating in the filed appraisal *778 and at trial that the value of the fixtures should be limited by the marketplace. Thus, while Enterprise’s appraisal formally adheres to the format of reproduction cost new less depreciation, in actuality it limits that outcome by the market value of the fixtures in the hands of used machinery dealers. It is apparent to the court that Enterprise manipulated the percentage of depreciation so that, after subtracting that amount from the reproduction cost new, the result would approximate the off-premises used fixture price. As previously stated in this decision, although there may be a market for severed fixtures in the hands of used machinery dealers, there is no such market for specialty trade fixtures in place. The ultimate values that Enterprise arrived at are merely the values of the severed fixtures in the hands of used machinery dealers. Simply put, they are neither the same products nor do they represent the value of trade fixtures in place in the hands of the lessee owners of the fixtures. (See, supra, at 775.)
Moreover, the court finds that neither the memorandum prepared by the Nathans’ counsel nor the tax return filed by claimants is determinative of the sound value of the trade fixtures in place. While they conceivably could be probative of the nominal price assigned to the fixtures as part of the 1980 sale from the Nathans to Universal, the court finds that the sale was not an arm’s length independent transaction but, rather, was a dependent component of and economically linked to a single package sale and lease of the scrapyard and metal recycling business. This finding is based on the evidence and testimony adduced at trial. Most significantly, Joseph R. Jiampietro, president of both Universal Empire and Universal Waste and a partner in the W.J.K. Partnership, testified that he paid $1,400,000 for the entire package.
"We had — the way I looked at it was a million four hundred thousand dollar deal. It was a million four hundred thousand dollars. I arrived at that by looking at the productivity of the yard and the dollars that we could generate per ton, and the related expenses to that. It then became a negotiating point between the accountants and the attorneys as to how that was going to be split up, as to which part went to the lease, which part went to the allocation of the equipment, which part went to the other components of the overall deal. To me the overall deal, it was a million four hundred thousand package. I knew that is what I could afford to pay, and be able to sustain it. * * *
"That is, I believe in the Nathan deal there were 600— $580,000 allocated to the equipment that was contained in *779 Schedule A, to the best of my recollection. What happened was that our accountants and the Nathan accountants got together and valued each piece of equipment. I don’t even think I was involved with the whole situation. They came up with a fee, a cost for that equipment so that it would come out to $580,000, and then the other components of the deal went along with it.”
That package included, in addition to the fixture sale, the sale of hundreds of thousands of dollars of personal property, the lease of 1.807 acres of real property owned by the Nathans, the assignment of a lease of 4.277 acres between the Nathans and the railroad and the employment of David H. Nathan. As indicated above, Mr. Jiampietro testified that it was a negotiating matter between the accountants and the attorneys as to how the $1.4 million would be allocated for accounting and tax purposes. The court accepts Mr. Jiampietro’s testimony on this point because his testimony was clearly supported by other apparently unrelated evidence. In the companion claim of the Nathans tried herewith, the appraisal submitted by Enterprise on behalf of the defendant convinces the court that the $60,000 per annum rental paid by claimants for the leased Nathan property was excessive by approximately 30% on a capitalized basis. This is strong evidence that the allocations between the various components of the over-all package do not reflect the actual values of such components but rather reflect business, accounting and tax judgments.
The State introduced an analysis by Enterprise that purported to demonstrate that the prices listed next to each item on the Nathans’ attorney’s memorandum "were within the range of normal fair market values”. In that analysis, Enterprise demonstrated that the indicated sales prices for the four largest portable items, totaling $203,000, were within the fair market value range of used machinery in the hands of dealers. Thus, Enterprise concluded that the indicated sales price for the six fixtures also represented a fair market value price. This might very well be accurate if the six trade fixtures were not affixed to the real property but were portable like the other equipment listed. As discussed above, however, trade fixtures in place are valued differently than portable machinery in the hands of a used machinery dealer. The court is of the opinion that the allocations on the attorney’s memorandum represent approximate market value prices for portable *780 machinery in the hands of used machinery dealers and are not sound value prices of trade fixtures in place.
Defendant likewise asserts that the placing of the nominal values on a tax return by claimants constitutes an admission against interest. The placing of these values on the tax return was for purposes of depreciation and investment tax credits. The purpose of the entry was to write off the taxpayer’s investment and not for the purpose of valuing items. Such entries involve a delicate balance between maximizing tax write-offs and minimizing capital gains tax (both with respect to the claimants and to the Nathans). As the Appellate Division has stated in Matter of City of New York (Maxwell) (15 AD2d 153, 163): "In the former [franchise tax returns] the value is supposed to represent the amount at which the property is carried on the corporate books. This may be the cost price or whatever other figure is occasioned by the accounting practice of the corporation making the return. It is not an admission of value in any sense and not binding as such.”
Accordingly, for all the reasons discussed above and especially because the court finds that the allocation of the overall $1.4 million purchase price to the various components of the package deal were made arbitrarily for accounting and tax purposes and not for valuation, the court holds that the above attorney’s memorandum and the tax return are not credible evidence of valuation and do not constitute admissions against interest.
At this stage, it is appropriate to set forth summaries[4] of the salient features of each of the four appraisals with respect to the six fixtures.
VALUATION OF D & J BALER
[[Image here]]
*781 VALUATION OF GALLAND-HENNING BALER
[[Image here]]
i- Truck Pit Only
The difference between the reproduction cost as determined by Koenig and D & J, on the one hand, and Enterprise, on the other hand, is that Koenig and D & J essentially did not *782 use reproduction cost but rather replacement cost.[5] Apparently, this was because the exact fixtures in question are no longer being produced. Technology has so far advanced that items currently being manufactured are intrinsically superior to most of the subject fixtures. Thus, using replacement value to determine sound value overvalues the subject fixtures. The more appropriate methodology in the case at bar is to ascertain the original cost of the fixture installed and trend that value to the date of appraisal by an appropriate inflation factor such as that published by Marshall & Swift. This is the approach followed by Enterprise. For these reasons, I will adopt the value determined by the State’s appraiser for the reproduction cost new of each fixture.[6]
Consonant with the foregoing discussion, I adopt the Enterprise reproduction cost new values and the percentage of accrued depreciation determined by D & J. Combining both of these categories produce sound values for each fixture, well within the range of values established by all four appraisals. I am not applying any separate or additional deduction for functional depreciation or obsolescence for the following reasons. Firstly, there has been no showing that claimants’ scrapyard business was not being operated profitably with the instant fixtures. (Barber & Bennett v State of New York, 34 AD2d 303, supra; Matter of City of New York [Ruppert Brewery Urban Renewal Project], 67 Misc 2d 863, supra.) Moreover, it appears that D & J has already made allowance for such depreciation in their total estimate of accrued depreciation. Thus, I make the following award for each fixture:
*783 [[Image here]]
!• In estimating accrued depreciation for this item, Enterprise determined that the item was 20 years old and had a 40-year useful life. Utilizing the 5% declining balance method of depreciation produced the 64% depreciation that Enterprise adopted. However, the court believes that 50% straight line depreciation is more appropriate because we are essentially dealing with physical depreciation and not accounting methods of recapturing invested capital.
The Chief Clerk is directed to enter judgment for claimants in the sum of $831,572, with appropriate interest. Inasmuch as this claim was filed on October 28, 1986, within six months of the date of taking, claimants are entitled to interest from July 25, 1986, the date of taking to the date of decision and thereafter to entry of judgment.

. Map No. 53 described appropriated parcel Nos. 2, 16, 43, 44, 45 and 52; map No. 65 described appropriated parcel No. 56; map No. 66 described appropriated parcel Nos. 57 and 59; map No. 67 described appropriated parcel No. 58; map No. 69 described appropriated parcel No. 60; map No. 70 described appropriated parcel No. 61; map No. 85 described appropriated parcel Nos. 75, 76 and 80; and map No. 87 described appropriated parcel No. 81.

. Claimants’ counsel stated at trial that they were prepared to stipulate *775 to withdraw such claims; however, no such stipulation was ever actually entered into between the parties.

. This misconception arose because there was no production between January and June of 1986 because the City of Utica was installing a new sewer line through the yard. This construction severed rail lines and created large temporary ditches, making it dangerous for trucks to use the premises. Claimants ultimately obtained an order from Supreme Court, Oneida County, compelling the City of Utica to vacate the yard.

. To make each appraisal compatible with the others, certain adjustments were required, but the values set forth fairly and accurately reflect the values contained in the original appraisals.

. "In appraisal terminology 'reproduction cost’ is defined as the cost of an identical facility or replica, and 'replacement cost’ as the cost of a property having utility equivalent to the property being valued * * *. The courts generally use the term 'reproduction costs’ but do not recognize the technical distinction between the two terms.” (4 Nichols, Eminent Domain § 12C.01 [3] [b], n 91 [3d rev ed]; see also, Model Eminent Domain Code § 1111, comment.)

. With respect to the truck scale and pit, Enterprise used replacement cost new because the original cost of each item could not be determined.