TIROLERLAND, INC., and Barbara Scsigulinsky, Individually and as Executrix of the Estate of Frank Scsigulinsky, Plaintiffs,

v.

LAKE PLACID 1980 OLYMPIC GAMES, INC.; Lake Placid Olympic Organizing Committee; Peter Spurney, J. Bernard Fell, William Kissel, Peter Roland, and James Brooks, all Individually and as Directors, Officers, Agents and/or Members of Lake Placid 1980 Olympic Games, Inc. and/or Lake Placid Olympic Organizing Committee; New York State Olympic Accommodations Control Corp.; Roger Tubby, and Millard J. Smith, Individually and as Directors, Officers and Agents of New York State Olympic Accommodations Control Corporation; William Hennessy, Individually and as Commissioner of Transportation of the State of New York, Defendants.

No. 83–CV–102.

United States District Court, N.D. New York.

June 28, 1984.

Wager, Taylor, Howd, Brearton & Kessler, Troy, N.Y., for plaintiffs; Michael W. Kessler, Troy, N.Y., of counsel.

Robert Abrams, Atty. Gen., State of N.Y., Albany, N.Y., for defendants N.Y. State Olympic Accommodations Control Corp., Tubby, Smith and Hennessy; John J. Pickett, Dennis McCabe, Asst. Attys. Gen., Albany, N.Y., of counsel.

## MEMORANDUM–DECISION and ORDER

MINER, District Judge.

### I

This action arises out of an alleged taking of property without just compensation in violation of the fifth and fourteenth amendments to the United States Constitution. The action is brought pursuant to 42 U.S.C. § 1983 and jurisdiction is predicated upon 28 U.S.C. §§ 1331 and 1343. Before the Court are motions by all defendants for summary judgment, Fed.R.Civ.P. 56(b).

### II

#### A. *Background*

In the winter of 1980, a bonanza befell the small, upstate New York village of Lake Placid, when, after an absence of forty-eight years, the Winter Olympic Games ("Games" or "Olympics") returned. In spite of its name, the community was not merely a quiet or passive beneficiary of random good fortune. In 1954, twenty-two

years after hosting the 1932 Winter Olympics, a small group of area residents began to mount a determined effort to bring the Games back to the United States and to Lake Placid. Over the course of the next twenty years, ten bids were presented to both the United States Olympic Committee and the International Olympic Committee. On October 27, 1974, the XIII Olympic Winter Games were awarded to the ambitious village nestled in the scenic surroundings of northern New York.

The logistics of accommodating the Games presented needs which were themselves of olympic proportions, and appropriate preparations were in order. An integral part of those preparations included ensuring the community's ability to house, in reasonable accommodations, what ultimately turned out to be 60,000 visitors, athletes, and officials. As part of the overall plan to provide housing facilities, New York State enacted into law Chapter 912 of the Laws of 1977 ("Chapter 912" or "statute"). Titled "AN ACT in relation to the regulation, control and stabilization of hotel, motel and other lodging accommodations available to the public during the XIII—1980 Olympic Winter Games at Lake Placid, New York," the statute provided in part, as follows:

> The legislature hereby finds and determines that the conduct of the XIII olympic winter games at Lake Placid and the availability of hotel, motel and other lodging facilities to the general public, as well as to those persons required to be provided with lodging, or determined by the accommodations staff of the Lake Placid 1980 olympic games, inc., to be a matter of state concern and that an appropriate mechanism for the regulation, control and stabilization of rates for such lodging facilities is essential to insure proper conduct of the games.

> To assure that the required facilities are available and ready for required olympic use during the olympic period and to further assure that the rates charged for such facilities are reasonably and properly regulated, controlled and stabilized, the legislature hereby finds

and declares that there should be created a corporate governmental agency, constituting a public benefit corporation, to be known as the "Olympic Accommodations Control Corporation", which could undertake appropriate measures relating to lodging rates and be vested with a preferential right to provide for the acquisition and allocation of commercial lodging facilities during the olympic period to meet the requirements of the Lake Placid nineteen hundred eighty olympic organizing committee.

Chapter 912, § 1.

The statute created the defendant Olympic Accommodations Control Corporation ("OACC") for substantially two purposes: to regulate hotel and motel room rates during the Olympic period, Chapter 912, § 4(9), and to provide that hotel and motel accommodations were available for persons whose attendance was necessary for the conduct of the Games, Chapter 912, § 5. OACC was empowered to exercise a "preferential right of leasing" hotel and motel rooms in the Olympic region, *id.*, although the statute provided for a release of the preferential right upon the granting by OACC of an application made by a motel owner, *id.*

The enactment and implementation of that statute provides the basis for plaintiffs' challenge here, a challenge which underscores, along with recent political events and our memories of the controversial Summer Olympics of 1980, the disheartening fact that the Games have strayed considerably from their ancient and once exalted stature.

### B. *The parties*

#### 1. *Plaintiffs*

Plaintiff Tirolerland, Inc., was the owner of the Tirolerland Motel and Restaurant located in the town of Jay, New York, eighteen miles from Lake Placid. Plaintiff Barbara Scsigulinsky, individually and as proposed executrix of the estate of Frank Scsigulinsky, was, with her late husband, a principal of Tirolerland, Inc. and a co-owner of the Swissaire Motor Lodge, also located

in Jay, New York. Both motels went out of business following the Olympics, allegedly as a result of defendants' actions.

Plaintiffs' two motels contained a total of fifty-one guest rooms. Traditionally, plaintiffs opened their full fifty-one units only for the peak summer seaon, keeping only ten Tirolerland units open during the entire year. Swissaire was entirely closed during the winter months. For the month of February in the three years preceding the 1980 Games, plaintiffs had an average gross income of $1,938.00. The peak August figures for the same three year period showed an average gross income of approximately $15,257.00. By contrast, plaintiffs' gross receipts for the three week Olympic period totaled $38,349.04 at Tirolerland, and $32,648.72 at Swissaire. Affidavit of Mark Adler, ¶ 16.

### 2. Defendants

Described by plaintiffs as the "Olympic" defendants are the Lake Placid Olympic Organizing Committee ("LPOOC") and its alleged alter ego, Lake Placid 1980 Games, Inc., the entities which bid and undertook to run the 1980 Winter Olympic Games. Defendants Peter Spurney, J. Bernard Fell, William Kissel, Peter Roland, and James Brooks, were officers of the defendant organizations and allegedly played an active role in the acts here complained of. The remaining, or state defendants, include OACC and its officers, Messrs. Roger Tubby and Millard J. Smith. Finally, William Hennessy, New York State's Commissioner of Transportation, is also named as a defendant.[1]

### C. The present claims

In January of 1979, OACC served plaintiffs, as well as other motel owners, with notices of intention to acquire all guest rooms at both Tirolerland and Swissaire.

Soon thereafter, plaintiffs entered into various agreements with LPOOC and the Canadian Broadcasting Company ("CBC") consenting to rental of the rooms at a rate of $60.00 a day. The rental period encompassed a twenty-one day span from February 5, 1980 through February 25, 1980. Ultimately, plaintiffs were awarded an additional $5.00 for each guest room day.

The gravamen of plaintiffs' complaint is that the acts of defendants effected an unconstitutional taking of their property without just compensation. In more specific terms, the amended complaint sets forth four purportedly distinct causes of action. It alleges first that the defendants, acting pursuant to Chapter 912, did

> appropriate, condemn, take, and convert to their own use, the property of the plaintiffs by preventing them from renting the motel rooms owned by plaintiffs to such persons and at such rates as the plaintiffs deemed appropriate and in fact such defendants required that the plaintiffs rent all the motel rooms operated by them, solely to persons selected by the defendants and at rates determined solely by the defendants substantially lower than rates which market conditions would otherwise dictate, without the consent and over the objection of the plaintiffs and without proper and reasonable and just compensation therefor.

Amended complaint, ¶ 39.[2]

As a second cause of action, the amended complaint alleges that the defendants intentionally closed the roads in the vicinity of Lake Placid, "thereby preventing access by the general public and would-be patrons of the plaintiffs' establishments," amended complaint, ¶ 51, and resulting in a taking without just compensation. The third and fourth causes of action are essentially reit-

---

**1.** Pursuant to a stipulation among counsel for the parties dated February 2, 1984, Peter Roland, William Kissel, and William Hennessy have all been dismissed from the action.

**2.** The first cause of action alleges a taking as well stemming from defendants' placement in plaintiffs' motels of persons who tended not to patronize the Tirolerland Motel's restaurant,

thereby "depriving plaintiffs of any reasonable profits which would otherwise have resulted but for the defendants' actions." Amended complaint, ¶ 42. Coupled with these takings claims is plaintiffs' vague allegation that the acts of defendants denied plaintiffs their equal protection rights. *See infra* IV B.

erations of the first two, and no additional claims are therein raised.

All defendants have moved for summary judgment against the amended complaint based on a variety of legal theories. Because the Court finds that the challenged actions did not amount to an unconstitutional taking, it is unnecessary to reach defendants' other arguments.[3]

### III

On motions for summary judgment, it is well established that the Court's function "is not to resolve issues of fact but to determine whether any material factual issues are raised after resolving all questionable inferences in favor of the party against whom the judgment is sought. Only if no material factual issues exist may summary judgment be granted." *United States v. Matheson*, 532 F.2d 809 (2d Cir.), *cert. denied*, 429 U.S. 823, 97 S.Ct. 75, 50 L.Ed.2d 85 (1976); *see also Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 444–45 (2d Cir.1980); *Heyman v. Commerce & Industry Insurance Co.*, 524 F.2d 1317, 1319 (2d Cir.1975). Although the moving party bears the burden of clearly establishing the non-existence of any issue of fact that is material to a judgment in his favor, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–61, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), the party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him." Fed.R. Civ.P. 56(e); *In re B.D. International Discount Corp. v. Chase Manhattan Bank, N.A.*, 701 F.2d 1071, 1077 n. 11 (2d Cir. 1983), *cert. denied*, — U.S. —, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983).

As will be evident from the discussion which follows, there are no disputed factual questions which preclude this Court from finding that no unconstitutional taking has occurred. Moreover, certain undisputed facts make it abundantly clear that the present action would, in any event, be barred by the applicable statute of limitations.

### IV

#### A. *The takings analysis*

■ The fifth amendment, made applicable to the states through the fourteenth amendment, proscribes the taking of private property for public use without just compensation. There is no longer any question that in certain circumstances, government action short of an actual physical invasion will nonetheless constitute a taking. *See, e.g., Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) ("*Penn Central*"). Since "not every destruction or injury to property by governmental action has been held to be a 'taking' in the constitutional sense," *Armstrong v. United States*, 364 U.S. 40, 48, 80 S.Ct. 1563, 1568, 4 L.Ed.2d 1554 (1960), however, the question of whether a taking has occurred "requires an examination of whether the restriction on private property 'forc[es] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Pruneyard Shopping Center v. Robins*, 447 U.S. 74, 83, 100 S.Ct. 2035, 2041, 64 L.Ed.2d 741 (1980) (quoting *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)); *see also Penn Central*, 438 U.S. at 123, 98 S.Ct. at 2659. This in turn, entails an "inquiry into such factors as the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations." *Pruneyard Shopping Center*, 447 U.S. at 83, 100 S.Ct. at 2041; *Penn Central*, 438 U.S. at 124, 98 S.Ct. at 2659. Only when government "regulation goes too far [will it] be recognized as a taking," *Pennsylvania Coal Co.*

---

**3.** Assuming, arguendo, that plaintiffs have stated a viable takings claim, the Court nonetheless finds that claim to be barred by the statute of limitations. *See infra* IV C.

*v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922), since "[g]overnment hardly could go on if, to some extent, values incident to property could not be diminished without paying for every such change in the general law ...." *Id.* at 413, 43 S.Ct. at 159.

■ A taking does not occur merely because governmental action burdens or restricts some particular right or interest in property. Before a taking transcends constitutional limitations, the government must deny the owner all or an essential use of his property. *See United States v. General Motors Corp.,* 323 U.S. 373, 378, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945). In essence, plaintiffs claim here that because they were compelled to comply with the regulations effected pursuant to Chapter 912, they were denied the entire use of their property and suffered a taking by these defendants. In more particular terms, plaintiffs contend that the acts of defendants in their "occupation and use" of plaintiffs' motels was so complete as to leave plaintiffs with only "the right to make the beds and pay the bills." Affidavit of Michael W. Kessler, ¶ 22.

In reality, plaintiffs' true dissatisfaction stems from their disappointment in not being able to price-gouge Olympic patrons who sought motel accommodations. This Court is persuaded, however, that under the relevant analysis, plaintiffs were in no sense subjected to an unconstitutional taking of their property without just compensation.[4]

### 1. *Generally*

■ As a preliminary matter, the Court notes "that the fifth amendment is deemed to allow state and local governments broad power to regulate housing conditions without paying compensation for all resulting economic injuries." *Sadowsky v. City of New York,* 732 F.2d 312, 317 (2d Cir.1984); *see also Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 440, 102 S.Ct. 3164, 3178, 73 L.Ed.2d 868 (1982). Moreover, "a taking is less likely to be found when the challenged interference with a property interest 'arises from some public program adjusting the benefits and burdens of economic life to promote the common good,' than when the interference entails a physical invasion of the property by the government." *Sadowsky,* 732 F.2d at 317 (quoting *Penn Central,* 438 U.S. at 124, 98 S.Ct. at 2659).

■ The state is accorded wide latitude under its police power to regulate private property in the interest of the public's general welfare. *See, e.g., Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 417, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922) (Brandeis, J., dissenting) ("Every restriction upon the use of property, imposed in the exercise of the police power, deprives the owner of some right theretofore enjoyed, and is, in that sense, an abridgment by the state of rights in property without making compensation. But restriction imposed to protect the public health, safety, or morals from dangers threatened is not a taking .... The state merely prevents the owner from making a use which interferes with paramount rights of the public").

■ The jurisprudence which has evolved in the area of zoning regulations is easily adaptable to the present situation. In those cases, only the most unusual and wholly arbitrary ordinance will require the granting of compensation to a property owner. As long as the zoning ordinance

---

**4.** As an initial matter, the Court rejects plaintiffs' taking challenge insofar as it relates to an alleged closing of the roads in the vicinity of their motels. In addition to the analysis set forth below, several points are in order. First, plaintiffs appeared to have abandoned this claim at oral argument. Second, the only defendant against whom this claim might have been maintained, New York Commissioner of Transportation William Hennessy, has been dismissed as a defendant upon the consent of the parties. *See supra* note 1. Finally, a closing of the roads in the vicinity of plaintiffs' motels simply did not amount to a taking. *See Stipe v. United States,* 337 F.2d 818, 821 (10th Cir.1964); *Bopp v. New York,* 19 N.Y.2d 368, 372–73, 280 N.Y.S.2d 135, 139, 227 N.E.2d 37, 39 (1967). Plaintiffs' taking claim with respect to the alleged losses suffered by their restaurant is similarly without merit.

reasonably advances some police power interest, no compensation will be required. In *Penn Central*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631, the Supreme Court noted that "in instances in which a state tribunal reasonably concluded that 'the health, safety, morals, or general welfare' would be promoted by prohibiting particular contemplated uses of land, this Court has upheld land-use regulation that destroyed or adversely affected recognized real property interests." *Id.* at 125, 98 S.Ct. at 2659 (citations omitted); *see also Agins v. City of Tiburon*, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980). Indeed, the application of a zoning law effects a taking only if the statute does not substantially advance legitimate state interests or denies an owner economically viable use of his property. *Id.* at 260, 100 S.Ct. at 2141. As will be discussed below, there is no question that plaintiffs were not denied any "economically viable" use of their properties.

With respect to a substantial and legitimate state interest, the stated purpose of Chapter 912 embodied a legislative determination that the regulation of lodging rates was "essential to insure proper conduct of the games." That determination may not be lightly overturned since the state's broad power in enacting economic regulation is subject only to limited scrutiny. *See Nebbia v. New York*, 291 U.S. 502, 537, 539, 54 S.Ct. 505, 516, 517, 78 L.Ed. 940 (1934). This Court has little difficulty concluding that the state's regulatory actions were rationally based. Doubtless, without some form of state control over the logistics involved in accommodating the Olympics, the Games might never have visited Lake Placid. Even were it possible for the Olympics to have been held absent state regulation, it is clear that such regulation had a legitimate purpose in protecting the visiting public from precisely the type of behavior plaintiffs would have undertaken.

The instant regulations are also analogous to rent control statutes which have long survived constitutional attack. *See Bowles v. Willingham*, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944); *Block v. Hirsh*, 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865 (1921);[5] *Eisen v. Eastman*, 421 F.2d 560, 567 (2d Cir.1969), *cert. denied*, 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed.2d 75 (1970); *Israel v. City Rent and Rehabilitation Administration*, 285 F.Supp. 908, 910 (S.D. N.Y.1968); *see also Nebbia v. New York*, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934) (price controls). Plaintiffs' distinction between the constitutionality of "residential" rent control as opposed to "commercial" rent control, is unpersuasive at best. The aim of the present regulations was to protect the renting public. The Court attaches no particular significance to the fact that plaintiffs' motels happened to have been rented to corporate entities. Indeed, precisely because corporations would have been both able and likely to pay rates no matter how high, the absence of state regulation would have created a situation in which corporate bidders would have pushed prevailing rates skyward in their effort to reserve rooms, thereby pricing the general public completely out of the market.

2. *The* Penn Central *factors*

In *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), the Supreme Court laid down a tripartite inquiry to be applied in any takings analysis.

In engaging in these essentially ad hoc, factual inquiries, the Court's decisions have identified several factors that have particular significance. The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations.

---

**5.** While *Bowles* and *Block* dealt with the constitutionality of rent control in emergency wartime situations, they are nonetheless applicable to the present case. "A limit in time, to tide over a passing trouble, may well justify a law that could not be upheld as a permanent change." 256 U.S. at 157, 41 S.Ct. at 460.

So, too, is the character of the governmental action. A "taking" may more readily be found when the interference with property can be characterized as a physical invasion by government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good.

438 U.S. at 124, 98 S.Ct. at 2659 (citations omitted); *see also Sadowsky v. City of New York*, 732 F.2d 312, 317 (2d Cir.1984). An evaluation of all these factors leads to the inescapable conclusion that plaintiffs have suffered no unconstitutional taking.

### Economic impact

 In essence, plaintiffs point to the severe financial hardship they claim to have suffered as a consequence of not being able to charge rates that the market would have borne. It is clear, however, that "prohibition of the most profitable or beneficial use of a property will not necessitate a finding that a taking has occurred." *Sadowsky v. City of New York*, 732 F.2d 312, 317 (2d Cir.1984); *Andrus v. Allard*, 444 U.S. 51, 66, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979); *Penn Central*, 438 U.S. at 130, 98 S.Ct. at 2662 ("the submission that appellants may establish a 'taking' simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development is quite simply untenable").

The Court finds it difficult to conclude that the revenues achieved by plaintiffs for the Olympic period, which were far greater than any previous period, evidence the presence of a taking. Plaintiffs' strongest argument is that the $65.00 a night rate at which they were compensated was computed irrationally since it was based on peak summer rates which did not account for winterization and other costs attendant upon serving the Olympics' needs. Whatever merit this "inadequate compensation" argument may otherwise possess, it is clear that it does not propel the defendants' ac-

tions into the realm of a taking. The critical flaw with plaintiffs' contention lies in their erroneous assumption that the three-week period during which they were subject to the challenged actions is somehow separable from their property interest in general. They reason that because they were deprived of a more profitable use of their property for a three-week period they were thereby subjected to an unconstitutional taking. Such a view, however, misapprehends the very nature of the taking doctrine:

> "Taking" jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole ....

*Penn Central*, 438 U.S. at 130–31, 98 S.Ct. at 2662–63. Because the actions challenged herein affected at most a temporally brief period,[6] plaintiffs' reliance on the inadequate compensation rate loses much of its significance.

Of paramount importance here is the fact that the three-week "taking" could have infringed only minimally plaintiffs' more general rights in their property as a whole. Because the essential value of plaintiffs' property was left undisturbed by the defendants' evanescent regulations, no taking properly may be found to exist. As the Supreme Court has noted, " 'taking' challenges have ... been held to be without merit in a wide variety of situations when the challenged governmental actions prohibited a beneficial use to which individual parcels had previously been devoted and thus caused substantial individual harm." *Penn Central*, 438 U.S. at 125, 98 S.Ct. at 2659; *see also Andrus v. Allard*, 444 U.S. 51, 65–66, 100 S.Ct. 318, 326–27, 62 L.Ed.2d 210 (1979) ("the denial of one traditional property right does not always amount to a taking. At least where an owner possesses

---

**6.** The transitory nature of the defendants' ac- tions is discussed in more detail *infra.*

a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety"); *Sadowsky v. City of New York*, 732 F.2d 312, 318 (2d Cir.1984) (three-year moratorium faced by plaintiffs on renovating SROs not a taking since all economically viable uses of property were not precluded, even though on sale of property plaintiffs might not recoup their costs); *Pompa Construction Corp. v. City of Saratoga Springs*, 706 F.2d 418, 421 (2d Cir.1983) (no taking where zoning ordinance permanently prohibited the commercial use for which plaintiffs had purchased property).

In sum, notwithstanding the statute, during the brief three-week Olympic period, plaintiffs' "bundle of rights" remained substantially unaffected. Plaintiffs maintained sole possession · of the property. Ownership of and title to the property were not affected, nor were the day-to-day operations of the motels or restaurant subject to regulation. There was no physical invasion of the premises by persons other than guests who were within the reasonable contemplation of commercial lodging facility owners who open their doors to the public.

Plaintiffs were not required to rent all their rooms but were free to continue their winter practice of opening only ten of the fifty-one units. Plaintiffs were free to sell, improve, enlarge, or reduce the size of the premises,· and to rent to anyone they chose upon obtaining a release from OACC.[7]

### Interference with "distinct investment-backed expectations"

As an initial matter, the Court notes that plaintiffs' investment surrounding the purchase of their motel properties was in no way induced by the prospect of capitalizing on the Olympic trade. Indeed, when plaintiffs purchased their first property in 1966, the community's hopes for a Lake Placid Olympics were still only nascent. While plaintiffs apparently did in fact invest some apparently modest sums in order to properly accommodate their trade, e.g., winterization, increased staffing, etc., any such investment was undertaken with full knowledge of the situation that would obtain come February of 1980. Plaintiffs knew the rates that would be permitted as early as 1979, when they signed agreements with LPOCC and the CBC.[8] Indeed, as early as

---

**7.** Plaintiffs, of course, dispute this characterization, arguing that

> defendants determined who would utilize the plaintiffs' facilities, how many people would stay in a room, the nature of the people that were assigned there, the rate that would be paid, the terms and conditions under which they would stay, the period for which they would occupy the rooms, how much of a deposit they would pay, when it would be earned, and the circumstances under which the intended acquisition could be cancelled in their sole discretion.

Kessler affidavit, ¶ 22. With respect to determining who would utilize the plaintiffs' facilities, three points are in order. First, plaintiffs were free to contract with any member of the designated "Olympic Family." Indeed, although some of plaintiffs' rooms were rented directly to LPOOC, who then matched those rooms with their selected guests, other rooms were rented directly by plaintiffs to the CBC. *See* defendants' exhibit P–2. Second, the Court has serious doubts whether an interference with the right to select one's tenants can amount to an unconstitutional taking. *See Troy Ltd. v. Renna*, 727 F.2d 287 (3d Cir.1984) (state statute protecting holdover tenants does not constitute taking with

respect to landlord's property); *see also Fresh Pond Shopping Center, Inc. v. Acheson Callahan*, —— U.S. ——, 104 S.Ct. 218, 78 L.Ed.2d 215 (U.S.1983) (dismissing appeal for want of a substantial federal question). Finally, even if plaintiffs were denied the right to choose their own guests, there is no question that they were compensated for the use made by those guests who did utilize their rooms.

All the factors enumerated by plaintiffs with respect to the control exercised by defendants do not, in any event, combine to evidence the substantial deprivation of property required to serve as the predicate for a takings challenge. While there is no doubt that plaintiffs were subjected to certain incidental regulation of their business, the attributes of actual ownership remained unaffected. Moreover, the use attributes of ownership, to the extent they were affected, were not so seriously diminished as to mark an unconstitutional taking.

**8.** The signed agreements, *see* defendants' exhibits P–2, P–3 & P–4, reflect rates of $60.00 a night, although plaintiffs ultimately were paid $65.00 a night. While plaintiffs claim that those rates were always subject to being increased, *see* Kessler affidavit, ¶ 17 at 31, there is no question

1979, plaintiffs expressed dissatisfaction with the deal they had struck, *see, e.g.,* Affidavit of Frank S. Scsigulinsky, ¶¶ 5–8, and yet elected to invest nonetheless. Plaintiffs acknowledge that "motel owners were required to comply with defendants' regulation or close," Plaintiffs' Memorandum of Law at 21, and yet opted not to close; accordingly, their "investment-backed expectations" were not seriously diminished by the acts of defendants. Plaintiffs could have refused to open and thereby avoided the investments they undertook.[9]

Having expended their funds with full knowledge of the circumstances, if not the results, it can hardly be said that plaintiffs' expectations were seriously undermined. "Furthermore, to the extent that [plaintiffs] did have expectations, however ill-advised, of immediate and unimpeded [exploitation] of the property, it must be recognized that, while the zoning law at issue in *Pompa* [706 F.2d 418] imposed a permanent prohibition against a certain use, the Law here imposed a prohibition which [was] temporary; after three [weeks] time it [would] no longer [have] restrict[ed] the property." *Sadowsky v. City of New York,* 732 F.2d 312, 318 (2d Cir.1984) (approving three *year* restriction). Clearly, those improvements which were implemented as a result of plaintiffs' investment remained a part of their property after the Olympics ended, and the benefits of such permanent improvements, far from being wasted efforts, would continue to redound to plaintiffs for as long as they owned the property.[10]

*Character of the governmental action*

In addition to the social welfare character of defendants' challenged actions, *see supra,* there are other factors present which militate heavily in favor of the determination that no taking has occurred. Foremost among these is the fact that the challenged action was merely transitory, lasting as it did for but a three-week interval, a period during which plaintiffs had traditionally shut down their operations almost entirely. The Supreme Court cases have "consistently distinguished between ... cases involving a permanent physical occupation, on the one hand, and cases involving a more temporary invasion, or government action outside the owner's property that causes consequential damages within, on the other. A taking has always been found only in the former situation." *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 428, 102 S.Ct. 3164, 3172, 73 L.Ed.2d 868 (1982) (citations omitted); *see also Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980); *Troy Ltd. v. Renna,* 727 F.2d 287, 302 n. 15 (3d Cir.1984). Indeed, in cases not involving physical invasions, the courts have consistently upheld as valid regulations which affected property owners for substantially longer periods of time. *See, e.g., Sadowsky v. City of New York,* 732 F.2d 312 (2d Cir.1984) (three years); *Pompa Construction Corp. v. City of Saratoga Springs,* 706 F.2d 418 (2d Cir.1983) (permanent prohibition of commercial use).

Moreover, the present situation does not entail a physical intrusion by government,

---

that plaintiffs based any investment decisions on the rates as they stood in 1979. Any claim that plaintiffs anticipated higher rates is belied by their continued objections to defendants' actions. That is to say, notwithstanding their expressed dissatisfaction with Chapter 912 and defendants' implementation thereof, plaintiffs chose to go forward with expenditures designed to prepare them for the Olympic season.

The Court finds disingenuous plaintiffs' claims that they were not aware that they would be renting their rooms on the basis of double occupancy rather than their preferred policy of four persons to a room until February of 1980. The agreements signed by Frank Scsigulinsky in

1979 set forth specifically that rooms were to be occupied by two persons.

9. Assuming, arguendo, as true plaintiffs' claim that they had no real choice regarding whether or not to open since if they remained closed defendants would have acquired and operated their properties, *see* Kessler affidavit, ¶ 18 at 35, the decision to remain closed at least would have spared plaintiffs the expense of those improvements and investments undertaken.

10. Indeed, such benefits would inure to plaintiffs even on the ultimate sale of their now enhanced properties.

"a property restriction of an unusually serious character for purposes of the Takings Clause." *Loretto*, 458 U.S. at 426, 102 S.Ct. at 3175. The Court in *Loretto* placed special emphasis on the less intrusive nature of a temporary, limited physical invasion, especially where, as it noted in *Pruneyard Shopping Center*, the owner had already invited the general public onto the property. In reviewing its decision in *Pruneyard Shopping Center*, the *Loretto* Court emphasized that "[s]ince the invasion was temporary and limited in nature, and since the owner had not exhibited an interest in excluding all persons from his property, 'the fact that [the solicitors] may have "physically invaded" [the owners] property cannot be viewed as determinative." 458 U.S. at 434, 102 S.Ct. at 3175 (quoting 447 U.S. at 84, 100 S.Ct. at 2042).

Plaintiffs' suggestion that defendants themselves occupied their property is simply without support. There is no question that plaintiffs' rooms were occupied only by Olympic visitors. Taking as true plaintiffs' contention that defendants to some extent selected who would stay in the various motels, this Court finds such a fact to be without significance. It cannot be disputed that guests at plaintiffs' motels were members of the general public contemplated by the statute. Certainly, the legislature was concerned not only with maintaining order in hotel accommodations for the benefit of the visiting American public, but as well for international visitors, especially those involved in the conduct of the games, e.g., officials and various media representatives.

For similar reasons, this Court rejects plaintiffs' tenuous suggestion that the "taking" here was not for a public purpose. Essentially, plaintiffs argue that their rooms were appropriated not for the use of the general public but for the use of private persons: "journalists, salesmen and executives." Plaintiffs' Memorandum of Law at 24. It is of course true, as plaintiffs point out, that property may not be taken for a private use even on making compensation. *Thompson v. Consolidated Gas Utilities Corp.*, 300 U.S. 55, 80, 57 S.Ct. 364, 376, 81 L.Ed. 510 (1937). Nonetheless, this Court cannot conclude that the actions here challenged constituted a taking for a private use. The scope of the public use limitation has been definitively resolved by the Supreme Court in *Berman v. Parker*, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954). Justice Douglas, writing for a unanimous Court, reaffirmed the rule that once a legislature has declared a condemnation to be for a public use, the role of the courts, as in the due process police power context, is an exceptionally narrow one. *See also Amen v. City of Dearborn*, 718 F.2d 789, 798 (6th Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 1596, 80 L.Ed.2d 127 (1984). Under that analysis, the state's exercise of its eminent domain power is for a public purpose whenever it is a means of realizing any object within its police power authority. The fact that the New York legislature determined, within the scope of its police power, that regulation of motel rates would inure to the benefit of the general public thus ends the inquiry. It is not necessary that plaintiffs' rooms should have been available to the general public in order to serve a public use; it is enough that the New York legislature determined that regulation of rates generally would serve the public interest.

Finally, the character of the government action here was not of such a nature as to impose a wholly unique burden upon these plaintiffs. Because the law was specifically applied to all motel owners,[11] plaintiffs therefore "share[d] with other owners the benefits and burdens of the [state's] exercise of its police power," *Agins v. City of Tiburon*, 447 U.S. 255, 262, 100 S.Ct. 2138, 2142, 65 L.Ed.2d 106 (1980), burdens "borne to secure 'the advantage of living and doing business in a civilized community.'" *Andrus v. Allard*, 444 U.S. 51, 67, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979) (quoting *Pennsylvania Coal Co. v. Mahon*,

---

11. Although of no legal significance, the Court finds it interesting that no other motel owners have joined in the present suit, nor to the Court's knowledge, commenced similar actions.

260 U.S. 393, 422, 43 S.Ct. 158, 162, 67 L.Ed. 322 (1922) (Brandeis, J., dissenting)).[12]

## B. *Additional claims*

While the taking challenge no doubt marks the crux of the instant action, it appears that new claims have suddenly emerged in response to the present motions. Catching the Court as well as defendants somewhat offguard, the affidavit of plaintiffs' counsel now interposes alleged equal protection and due process violations as well as pendent state law claims. While the amended complaint at least, but no more than, utters the words "equal protection," it makes no mention of either due process or state law violations. Because none of these claims is fairly presented by the pleadings, the Court would be entirely justified in refusing to entertain them.

The Court expresses its displeasure at counsel's frantic attempt to buoy the present suit with these belated claims, particularly since defendants have thereby been deprived of an opportunity to brief the issues. Since, however, these new-found claims are wholly without merit, the Court prefers to deal with them now rather than permit a further amendment to the complaint and the inevitable motions for summary judgment.

### 1. *Equal protection*

The well hidden equal protection claim which unfolds in counsel's discursive affidavit, *see* Kessler affidavit, ¶¶ 5, 9, 10(c) & 13, appears to challenge defendants' decision to regulate only motels, although Chapter 912 assertedly called for regulation of all "commercial lodging facilities."[13]

**12.** As a final matter, the Court notes that even assuming a taking may be found to have been effected by defendants' actions, that taking was not without just compensation. Plaintiffs premise their argument that the compensation was inadequate by looking to the market value of other lodging facilities during the Olympic period. While plaintiffs received rates of $65.00 a night, they point to, *inter alia,* the fact that room seekers were willing to pay up to $150.00 a night. *See generally* Kessler affidavit, ¶ 11. Plaintiffs' theory of what fair compensation would have been, however, misapprehends the proper approach to market valuation.

In general, of course, property that has been taken by the government must be compensated for at its fair market value. *See United States v. 564.54 Acres of Land,* 441 U.S. 506, 510–11, 99 S.Ct. 1854, 1856–57, 60 L.Ed.2d 435 (1979); *United States v. Miller,* 317 U.S. 369, 374, 63 S.Ct. 276, 280, 87 L.Ed. 336 (1943); *see also Kirby Forest Industries, Inc. v. United States,* — U.S. —, —, 104 S.Ct. 2187, 2194, 81 L.Ed.2d 1 (1984). That term, however, is "not an absolute standard nor an exclusive method of valuation." *United States v. Virginia Electric & Power Co.,* 365 U.S. 624, 633, 81 S.Ct. 784, 790, 5 L.Ed.2d 838 (1961). Because the standard of compensation is to be governed by "basic equitable principles of fairness," *United States v. Fuller,* 409 U.S. 488, 490, 93 S.Ct. 801, 803, 35 L.Ed.2d 16 (1973), the cases establish "the general principle that the Government as condemnor may not be required to compensate a condemnee for elements of value that the Government has created ...." *Id.* at 492, 93 S.Ct. at 804. The affidavit of Reverend J. Bernard Fell makes clear beyond any doubt that the defendants herein were themselves responsible for bringing the Olympics to Lake Placid and creat-

ing the increased value of plaintiffs' property. *See id.,* ¶¶ 5–11. Absent defendants' undertakings, plaintiffs' properties would have enjoyed only their traditionally sleepy profit prospects and would not have realized the market value enhancement to which plaintiffs now claim an entitlement. Just compensation here must necessarily be measured therefore in terms of a market value which existed prior to the onset of the state's enhancement actions. Since plaintiffs' sole claim of inadequate compensation is based on an erroneous demand to be compensated for the Olympic period value of their property, this Court cannot find such compensation as plaintiffs did receive to have been inadequate. Indeed, plaintiffs' remuneration for the three-week period far exceeded any amount they would have received absent the Lake Placid Olympics. *See e.g.,* Affidavit of Mark Adler, ¶¶ 16–17.

**13.** Additionally, plaintiffs argue that defendants did not even regulate all motels. *See* Kessler affidavit ¶ 13 at 23. That allegation, however, is not supported by the record. Plaintiffs refer the Court to their exhibit J–37, which appears to be an excerpted newspaper article. The language highlighted by plaintiffs consists of the following:

Finally a resolution was passed to urge the Marketing Division of the LPOOC to actively seek Olympic sponsors willing to winterize motels and cottages. A date will be determined after which the motels and hotels will be able to sign contracts for the remaining rooms and cottages with any party interested in winterizing them.

The request by the Lake Placid Resort Hotel to permit Sports Illustrated to winterize the

In order to mitigate the confusion engendered by plaintiffs' presentation of this particular claim, it is necessary to set forth the precise wording of the relevant statutory provisions. First, although the tenor of Chapter 912 suggests a concern for the availability and regulation of lodging facilities generally, section 1 clearly mandates only that OACC "be vested with a preferential right to provide for the acquisition and allocation of *commercial* lodging facilities ...." (emphasis added). While section 2(3) defines "lodging facility" to mean "any commercial or private dwelling suitable for habitation, including a camping ground, trailer, mobile home or private home," section 2(4) explains that a *"commercial* lodging facility" means "any building or portion of it which, in the normal course of business, is used and kept open for the lodging of guests, including a hotel, an apartment hotel, a motel, guest house, boarding house or club, whether or not meals are served." Chapter 912, therefore, did not require that lodging facilities other than commercial ones be regulated in the manner which plaintiffs now challenge.[14] Accordingly, the equal protection attack must be construed as limited solely to the facial validity of the statute's distinction between commercial and non-commercial lodging facilities.

In applying the equal protection clause "to most forms of state action, we ... seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose." *Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). In *Hodel v. Indiana,* 452 U.S. 314, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981), the Supreme Court reiterated the now familiar principle that a party raising an equal protection challenge to social and economic legislation not employing suspect classifications or impinging on fundamental rights bears a "heavy burden." *Id.* at 332, 101 S.Ct. at 2387. "Economic legislation must be upheld when the legislative means are rationally related to a legitimate government purpose. Such legislation carries with it a presumption of rationality that may only be overcome by a clear showing of arbitrariness or irrationality." *Textile Workers Pension Fund v. Standard Dye & Finishing Co.,* 725 F.2d 843, 856 (2d Cir.1984) (citing *Hodel,* 452 U.S. at 331–32, 101 S.Ct. at 2386–87). The initial discretion to determine classifications resides with the states and they "must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill." *Plyler v. Doe,* 457 U.S. at 216, 102 S.Ct. at 2394. Indeed, there is no longer any question that a state classification should not be overturned on equal protection grounds " 'unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational.' " *Barry v. Barchi,* 443 U.S. 55, 67, 99 S.Ct. 2642, 2650, 61 L.Ed.2d 365 (1979) (quoting *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 942, 59 L.Ed.2d 171 (1979)).

In short, there is no evidence in the record before the Court which may lead to a conclusion that the statute as written is unconstitutional on its face. Not only does the market regulation here manifest a legitimate public purpose, but the means em-

---

Edgewater cottage at a cost of $39,000 was approved. Sports Illustrated is a member of the Olympic Family.
The Court can hardly see how the above-quoted language demonstrates the failure of defendants to regulate all motels.

**14.** While Section 4(9) does in fact *empower* OACC to "establish, regulate, control, stabilize, and enforce maximum rates for *lodging facilities* in the olympic region...." (emphasis add-

ed), that section does not *require* such action with respect to all lodging facilities. While the legislature clearly sought to grant to OACC sufficient powers to manage the perceived accommodation problem, section 1 of the statute confirms the legislative intention that commercial facilities were the primary concern. Moreover, the thrust of plaintiffs' complaint addresses the preferential right of acquisition and allocation.

ployed were clearly related to that purpose. Plaintiffs have simply failed to show any irrationality or arbitrariness which would warrant a finding of constitutional infirmity. In light of the great deference which must be accorded to the legislative determination embodied by and expressed in Chapter 912, no equal protection violation may be found to exist.

■ This discussion does not end the matter entirely, however, since plaintiffs also challenge the manner in which defendants applied the statute.[15] The Kessler affidavit is replete with acrimonious allegations concerning defendants' implementation of the statutory scheme. At the heart of these attacks is the assertion that defendants had a personal interest in avoiding regulation of non-motel facilities and that such actions amounted to a deprivation of plaintiffs' equal protection rights. The Court, however, does not join in plaintiffs' conclusion.

Several points are in order. First, it is clear that while Chapter 912 empowered the OACC to regulate all *commercial* lodging facilities, it was not required to regulate other lodging facilities. *See* Chapter 912, § 1. Second, even plaintiffs' own evidence does not bear out their allegations. For example, plaintiffs point to the fact that while defendants Tubby and Smith knew that regulation of private homes was required, they voted not to regulate such facilities. *See* Kessler affidavit, ¶ 13 at 21–22. Moreover, plaintiffs note that these defendants recommended and voted on a policy to refrain from regulation of campgrounds. *Id.* at 22. Plaintiffs' characterization of defendants' actions, however, is not entirely lacking in self-serving embellishment. With respect to private homes, defendants did not vote to not regulate them but rather voted to control them through a system of guidelines. *See* plaintiffs' exhibits A–504, A–513, A–73. This was entirely consistent with section 1, however, since private homes were not required to be regulated. With respect to campgrounds, defendants did not vote to "refrain from regulation" but rather tabled consideration of such action pending publication of the "Transportation Plan for the Olympic Region." *See* plaintiffs' exhibit A–659. The Court is persuaded that plaintiffs' paranoid and conclusory allegations are simply devoid of any evidentiary basis, and they have failed to adduce any facts supporting the theory they now seek to advance.

Third, and perhaps most importantly, there can be no question that plaintiffs, as motel owners, were not "similarly circumstanced," *F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920), vis-a-vis campground and private home owners. Because "[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same," *Tigner v. Texas,* 310 U.S. 141, 147, 60 S.Ct. 879, 882, 84 L.Ed. 1124 (1940), the different treatment accorded plaintiffs here and other motel owners cannot be found to represent an equal protection violation.

The differences between motel owners and owners of other "lodging facilities" may be seen on two levels. First, on a purely intuitive basis, it is clear that motels serve functions and cater to needs different from either campgrounds or private homes. Although motels are in the business of renting space to public lodgers, private home owners generally are not. While some homeowners doubtless take in an occasional boarder, the "business" of the class of homeowners is, in the main, far removed from what is generally associated with commercial room providers. On the other hand, while campground proprietors are in the business of accomodating the lodging public, the type of service and the manner in which they provide that service

---

**15.** The Court reiterates its view that in light of the statutory mandate that only commercial lodging facilities be subject to regulation, no as applied challenge is appropriate. Nonetheless, to the extent Chapter 912 may be read, as plaintiffs apparently have, to confer upon defendants additional obligations regarding regulation of non-commercial facilities, the Court will consider plaintiffs' argument.

is vastly different from motel owners. While a motel offers its guests all the amenities of a home away from home, a campground provides little more than a place to park one's own "mobile" home, whatever its variety, and, presumably, certain basic services, e.g., sanitation, cooking, and the like.

On a factual level, the differences are even more important. First, while motels made their presence felt in the Lake Placid area in the form of nearly 3,200 rooms, *see* Kessler affidavit, ¶ 9, the record here indicates the presence of no more than a handful of campgrounds. *See* Plaintiffs' exhibit A–1306 ("about four"). Any need to regulate that small market presence was therefore insubstantial. It simply did not present the same potential problem to the Olympics as did the threat of myriad unregulated motels. Second, although private homes had obviously a large presence in the Lake Placid area, there was simply no reason to believe that that presence represented anything more than an essentially private dimension. In other words, since most, if not all, of such homes were private ones it would have been reasonable to assume their use would remain private. While all motels would most assuredly be rented to the visiting public, private homes would have been retained for private use by their owners. Even though some owners would have been, and indeed were, willing to relinquish the opportunity to view the Olympics in their own back yards in exchange for high rental profits, they were certainly of a different class than commercial motel owners. Additionally, and perhaps somewhat paradoxically, the sheer number of homeowners who necessarily would have been subject to any regulation was such as to make such regulation impracticable.

Finally, because of the deferential standard of review applicable with respect to an equal protection challenge to economic legislation, this Court can hardly find defendants' actions to have transgressed any constitutional equal protection proscriptions. The determination by these defendants, pursuant to their broad powers under Chapter 912, that motels were to be classified differently from other lodging facilities is entitled to great weight here. Exhibits provided by plaintiffs establish that the decision to regulate only motels was a rationally based one; accordingly, no equal protection violation may be found to exist. In particular, plaintiffs' exhibit A–1305–1306, minutes of a January 9, 1980 meeting of the OACC, reflect the reasons underlying OACC's decision:

> David Smith [New York State Assistant Attorney General] was recognized by the Chairman and expressed his concern that within the legislation in Section 4(9), it is indicated that the Corporation is mandated to establish maximum rates for "Lodging Facilities" which includes campgrounds.

> It is Mr. Smith's purpose today, he said, to determine why the Corporation decided to control only "Commercial Lodging Facilities."

> Counsel Batson reviewed the background of the Corporation's decision, noting that the decision was determined by a lack of the staff to monitor all "Lodging Facilities." He further stated that it was a practical decision based on the practical need to monitor the most immediate needs of the Olympics.

*See also* plaintiffs' exhibit J–26 (Letter from Millard J. Smith, Executive Director of OACC to David Smith, Assistant Attorney General). The assertion by plaintiffs that defendants chose not to regulate private homes because they themselves were homeowners finds absolutely no support in the record. Plaintiffs' desperate attempt to latch onto a letter written by Howard Baker, *see* plaintiffs' exhibit J–21, who is not a defendant, indicating his preference to rent out his house for the olympic season, is simply unavailing. Construed in the light most favorable to plaintiffs, that letter fails to provide any evidentiary basis for plaintiffs' irresponsible allegations.

In short, the Court is wholly satisfied, and the record makes clear, that the motivations underlying defendants' actions

were legitimate ones. Plaintiffs' have proffered little more than speculative, unfounded allegations to the contrary. Absent any factual questions concerning the propriety of defendants' application of Chapter 912, summary judgment is entirely appropriate. Plaintiffs' bare allegations are simply insufficient to suggest the presence of disputed issues of material fact.

### 2. Due process

In addition to the belated equal protection challenge, plaintiffs now interpose various due process claims stemming from defendants' actions. Apparently unable or unwilling to present clearly the claims which are perceived to exist, plaintiffs are content to simply utter the words "due process" in the hope that their mere incantation will bring to life an otherwise meritless suit. Plaintiffs insist on putting the onus on the Court to divine and properly articulate and support these claims. Compounding plaintiffs' already inexcusable presentation, it is not clear whether the alleged due process deprivations stem from substantive or procedural guarantees, or perhaps from both. In light of plaintiffs' now familiar approach to the statement of claims, however, the Court assumes that both branches of due process jurisprudence are being urged, and accordingly each will be discussed in turn.

As best as can be discerned from plaintiffs' disjointed presentation, the claims appear to relate to the "irrational manner" in which the statute was applied by defendants, including an "arbitrary" compensation formula and a disregard by defendants, who were not an independent body, for who was authorized to occupy motel rooms. Moreover, plaintiffs point to the lack of any administrative hearing process for the resolution of disputes.[16]

 With respect to a claim predicated on principles of substantive due process, suffice it to note that the exceptionally limited range of permissible judicial scrutiny compels rejection of any such claim. "[W]here the legislative judgment is drawn in question, [the inquiry] must be restricted to the issue whether any state of facts either known or which could reasonably be assumed, affords support for [the legislation]." *United States v. Carolene Products Co.*, 304 U.S. 144, 154, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938). In the area of economic regulation, as is the case here, "the existence of facts supporting the legislative judgment is to be presumed, for regulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional unless ... it is of such a character as to preclude the assumption that it rests upon some rational basis...." *Id.* at 152, 58 S.Ct. at 783. The legislative determination embodied in section 1 of Chapter 912, that the actions here challenged "may reasonably be deemed to promote public welfare," *Nebbia v. New York*, 291 U.S. 502, 537, 54 S.Ct. 505, 516, 78 L.Ed. 940 (1934), is not subject to this Court's review. *See id.; Ferguson v. Skrupa*, 372 U.S. 726, 731–32, 83 S.Ct. 1028, 1031–32, 10 L.Ed.2d 93 (1963) ("We refuse to sit as a 'superlegislature to weigh the wisdom of legislation'.... Whether the legislature takes for its textbook Adam Smith, Herbert Spencer, Lord Keynes or some other is no concern of ours"). Indeed, even absent that express legislative determination, this Court is entitled to presume a reasonable basis for the challenged statute and may hypothesize its own justification for its enactment. *See Williamson v. Lee Optical, Inc.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). "Whether the free operation of the normal laws of competition is a wise and wholesome rule for trade and commerce is an economic question which this Court need not consider or determine." *Northern Securities Co. v. United States*, 193 U.S. 197, 337, 24 S.Ct. 436, 456, 48 L.Ed. 679 (1904). "With the wisdom of the policy adopted, with the adequacy or practicability of the law enact-

---

**16.** Interestingly, although plaintiffs challenge the facial validity of the statute itself, it appears that the bulk of their due process claims focus on defendants' failure to comply with the statute's mandates. *See, e.g.,* Kessler affidavit, ¶¶ 10–12.

ed to forward it, the courts are both incompetent and unauthorized to deal." *Nebbia v. New York*, 291 U.S. at 537, 54 S.Ct. at 516. In light of the decisive weight to be given the state's chosen method of preparing for and protecting the public during the Olympic Games, plaintiffs' substantive due process claims are simply without merit.

With respect to procedural due process, a more detailed analysis is appropriate. Plaintiffs appear to challenge both the manner in which rates were set as well as the lack of any administrative hearing procedure in which to voice their general objections. The upshot of their claim is that they were denied their property without due process.

■ The appropriate inquiry of course concerns what process was due plaintiffs. It is now a familiar principle that a "fundamental requirement of due process ... is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). Due process "is not a technical conception with a fixed content unrelated to time, place and circumstances," *Cafeteria & Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961), but rather calls only for procedures tailored to the circumstances of particular situations. *Goss v. Lopez*, 419 U.S. 565, 578, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975). "The basic standard to be applied is one of reasonableness. The notice must be of such nature as reasonably to convey the required information ... and it must afford a reasonable time for those interested to make their appearance.'" *Soberal-Perez v. Heckler*, 717 F.2d 36, 43 (2d Cir. 1983) (quoting *Mullane v. Central Hanover*, 339 U.S. at 314, 70 S.Ct. at 657). *See*

*also Burtnieks v. City of New York*, 716 F.2d 982, 986–88 (2d Cir.1983).

■ The Court has carefully reviewed the voluminous submissions of both parties and is persuaded that the requirements of procedural due process were satisfied with respect to defendants' actions. Assuming that plaintiffs were entitled to some predeprivation mechanism through which to voice their objections, *see Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Burtnieks v. City of New York*, 716 F.2d at 987–89, such a remedy clearly was available.

First, while plaintiffs complain of defendants' failure to establish an administrative hearing procedure, any such omission was surely innocuous; section six of Chapter 912 expressly provided for suits against OACC in New York Supreme Court, and plaintiffs were free at any time to attack defendants' actions there. Indeed, precisely because plaintiffs were aware of and had protested against the perceived detrimental affects of defendants' action long before February of 1980, *see, e.g.,* Scsigulinsky affidavit, ¶¶ 5–8; deposition of Thomas Barry at 52, 60, plaintiffs had ample opportunity to seek vindication of their rights through a method contemplated by the statute. Moreover, plaintiffs had the option of pursuing an Article 78 proceeding under the New York Civil Practice Law. "Where, as here, Article 78 gave [plaintiffs] a meaningful opportunity to challenge [defendants' action, they were] not deprived of due process simply because [they] failed to avail [themselves] of the opportunity." *Giglio v. Dunn*, 732 F.2d 1133, at 1135 (2d Cir.1984) (footnote omitted). Moreover, the record makes clear that plaintiffs were afforded an opportunity, in the form of an open public hearing held by the OACC, in June of 1979, to offer their input and voice their objections. *See* affidavit of William Kissel, ¶ 21. Notably, plaintiffs elected not to attend such a meeting.[17] *See* exhibit G to Kissel affidavit. It

---

**17.** The record also establishes that from the earliest stages of defendants' actions, numerous open meetings were held. Even at what appear to have been closed meetings the minutes reflect

discussion engendered by public comments and complaints. *See, e.g.,* plaintiffs' exhibits A–1305–1306; A–893; A–895; J–60. Moreover, defendant Tubby, in questions put to him in the

is also clear that plaintiffs were afforded more than reasonable notice with respect to the rates that would be paid based on the maximum rate formula fixed by the statute and the rules and regulations promulgated thereunder. *See* plaintiffs' exhibit J–64 (OACC letter dated November 6, 1979 to all operators of commercial lodging facilities).

Finally, it is important to note that Chapter 912 and the regulations promulgated thereunder provided for a release which would entitle a motel owner to opt out, with the permission of OACC, of the regulatory scheme. *See* Chapter 912, § 5. Indeed, §§ 4500.4(d), (e) of the rules and regulations, 21 NYCRR §§ 4500.4(d), (e), outlined the specific manner in which such releases might be obtained. Plaintiffs argue, however, that no release would have been granted, and "[s]ince the law does not require a fruitless act, failure to apply for a release which would unquestionably have been denied ... is no bar to this action." Kessler affidavit, ¶ 19.[18]

First, plaintiffs' conclusion that a release would unquestionably have been denied is not supported by the record. In fact, the evidence in the present record is largely irrelevant to the question of whether plaintiffs knew in 1979 that no release would realistically be granted them. The evidence proffered by plaintiffs consists merely of documentation, obtained through discovery, which, in retrospect, supports their *present* conclusion that no release would have been granted. There is no evidence that plaintiffs were reasonably sure at the time a release should have been sought that one was not obtainable. The Court has, on its own, found at least four properties whose requests for release were granted. *See* plaintiffs' exhibit A–420 ("Lion's Den"); plaintiffs' exhibit A–657 (Ramada Inn of Lake George); plaintiffs' exhibit A–659 (Lake Placid Resort Hotel's "Edgewater Cottage"); plaintiffs' exhibit A–597 (Lake Placid Resort Hotel's "Mirror Loj"). While plaintiffs would no doubt argue that those releases were granted only because defendants saw no need for the released properties and that plaintiffs' properties would not enjoy a similar disposition, the evidence is simply insufficient to demonstrate any due process violation. Had plaintiffs sought a release and been denied one on allegedly improper grounds, their position would be somewhat stronger. Plaintiffs did not choose that route, however, and this Court is in no position to find a due process violation in a procedural mechanism which was never invoked. Plaintiffs may not simply omit to pursue a

course of a state court proceeding, alluded to at least a semblance of an administrative review procedure.

THE COURT: You are talking about setting up, are you not, an administrative hearing process?

Q. Has the corporation ever, or does it have a hearing process for the resolution of disputes?

. . . . .

THE WITNESS: I would say yes.

Q. Could you point out, please, Mr. Tubby, the area which verifies your answer? Where, in the rules and regulations, is such a process evident?

A. I don't know whether it is in the rules and regulations, but I know what our system has been—when anyone has come before the Board with a complaint—and you have been one of the them—the Board, as a whole, has heard the complaint and acted on it.

THE COURT: You consider that as complying with the mandate of establishing an administrative hearing process for the resolution of disputes?

THE WITNESS: Yes, I do.
Plaintiffs' exhibits J–68 to J–70.

18. Plaintiffs also argue, citing to § 4500.4(c)(4), that no release was available to them since their premises were newly winterized. Kessler affidavit, ¶ 19. The release made available in that section, however, is different from that offered by § 4500.4(d). The release contemplated by § 4500.4(c)(4) is in the nature of an automatic release, where a motel operator has not been notified of the rental of his rooms by January 15, 1979. Newly winterized facilities were not afforded the privilege of that automatic release but instead, an automatic release would be effected only if no notice was received by December 1, 1979. That is, owners of newly winterized facilities were not entitled to an automatic release as quickly as other owners. They were not, however, entirely foreclosed from obtaining an automatic release. In any event, the release contained in § 4500.4(d) was an additional mechanism of which plaintiffs were clearly entitled to avail themselves.

statutory remedy and justify that election on the post hoc speculation of futility. Precisely because plaintiffs had ample opportunity to free themselves of the regulations they now challenge, they were afforded due process. Had the available remedy proven defective, not only would plaintiffs have had a state court remedy but a federal one as well. Not having availed themselves of the procedures which were designed to protect their rights, plaintiffs will not now be heard to challenge those procedures. Plaintiffs were afforded all the process that was due and no constitutional deprivation may be found to have been suffered.

### 3. *Pendent state law claims*

■ Finally, the Kessler affidavit alludes to a host of violations stemming from defendants' failure to conform their actions to the mandate of Chapter 912. Again, these claims were not presented in either the original or amended complaint and should not, in fairness, be permitted to be interposed at this stage. Even were those claims properly pleaded, however, the Court would decline to exercise its discretion to retain pendent jurisdiction over such claims, having dismissed all the federal claims. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

### C. *Statute of limitations*

Although the parties have advanced a variety of purportedly applicable statutes of limitations, the Court is satisfied that a three-year period is controlling. *See Pauk v. Board of Trustees*, 654 F.2d 856, 861, 866 (2d Cir.1981), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1631, 71 L.Ed.2d 866 (1982). Because the Court concludes that plaintiffs interposed the present action more than three years after their claim had accrued, there can be no question that the action is time-barred.

■ Federal law determines when a claim accrues under § 1983. *Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir.1980), *cert. denied*, 450 U.S. 920, 101 S.Ct. 1368, 67 L.Ed.2d 347 (1981). The rule in this circuit is that a claim accrues when the plaintiff " 'knows or has reason to know' of the injury that is the basis of his action." *Pauk*, 654 F.2d at 859 (quoting *Singleton v. City of New York*, 632 F.2d at 191). Here, defendants argue that plaintiffs' claims accrued in January of 1979 when they were served with notices of the defendants' intention to acquire all motel rooms. Defendants argue alternatively that even if January of 1979 did not mark accrual of plaintiffs' claims, then certainly such claims had accrued by March and April of 1979 when plaintiffs entered into formal agreements for the rental of their rooms pursuant to defendants' now challenged scheme. The complaint in the present action was filed on January 27, 1983, nearly four years later.

■ Essentially, defendants contend that, although the alleged taking did not physically manifest itself until February of 1980, any injury suffered by plaintiffs accrued with notice of the acquisition and that the eventual occupation of their motel rooms marked simply the "inevitable consequence," *Pauk v. Board of Trustees*, 654 F.2d at 861, of the notice of acquisition. *See Chardon v. Fernandez*, 454 U.S. 6, 8, 102 S.Ct. 28, 29, 70 L.Ed.2d 6 (1981) ("proper focus is on the time of the *discriminatory act*, not the point at which the *consequences* of the act become painful" (emphasis in original)).

Plaintiffs argue strenuously that the *Pauk* analysis, developed in the context of employment terminations, is not controlling in the present takings situation. Essentially, plaintiffs note that they were not aware of the injuries they would suffer until February of 1980 with the onset of the actual occupation of their rooms. In contrast to *Pauk*, plaintiffs argue that "in this case there is nothing prior to February 1, 1980 that defendants can point to *that would have been apparent at the time it occurred*, which lead inevitably to the damages suffered by plaintiffs." Plaintiffs' Memorandum of Law at 7 (emphasis in original). "The dates prior to February 1,

1980 which are cited by defendants were merely dates that various events occurred relating to defendants' announcement that OACC intended to acquire plaintiffs' rooms. Nothing occurred on those dates to put plaintiffs on notice that they would suffer any of the damages complained of here." *Id.* Plaintiffs premise their argument on two grounds: First, they contend that notwithstanding the notices of intent to acquire, they had no idea of the damages they ultimately would incur until they learned in February of 1980 how their rooms were to be utilized. Second, plaintiffs argue that as a matter of law, a taking is not deemed to occur with the mere announcement of an intent to take but rather only upon a physical invasion. This Court rejects both of these arguments, the former because it is belied by plaintiffs' own affidavits and deposition testimony, and the latter because it is based on an omissive reading of takings jurisprudence.[19]

Plaintiffs attempt to persuade the Court that they were wholly ignorant of the ills that would befall them after having received notice of defendants' intention to acquire. The picture that is painted to support such a claim must necessarily imply that plaintiffs were entirely satisfied with the proposed regulations and, indeed, could have anticipated only enormous benefit to flow from their participation in hosting members of the Olympic Family. To accept the proposition that plaintiffs were oblivious to any potential damage alleged ultimately to have been suffered until February of 1980 was upon them, however, is to ignore essential contradictory facts which plaintiffs themselves have gone to

great pains to establish in another segment of their argument. In particular, in arguing that their agreement to the regulatory terms proposed by defendants was induced wholly as a result of coercion and duress, plaintiffs have acknowledged that as early as 1979, they were fully aware of the damage they would suffer from defendants' actions. The affidavit of Frank S. Scsigulinsky establishes beyond any doubt that prior to February of 1980, plaintiffs were aware of the effect defendants' actions would have. In relevant part, the affidavit notes as follows:

5. I was present when representatives of the Lake Placid Olympic Organizing Committee came to the Tirolerland Motel concerning acquisition of our rooms. They presented papers to my father for him to sign. He was told that the papers had to be signed in order to be paid for the rooms which the Olympic Committee intended to take during the Olympics. As far as either of us were aware, he had had [sic] no choice and was required to sign the papers. My father did not voluntarily contract to allow the Olympic Committee to use Tirolerland or Swissaire during the Olympic period. He bitterly opposed the seizure of these facilities. It was implied to him from various sources that his failure to cooperate could result in problems with the Health Department, his liquor license and the taxing authorities. He only signed the papers because he felt he had no choice in the matter.

6. Shortly after the Olympic Committee representatives came, my father was interviewed by Channel 5 television. He

---

**19.** In the Court's view, plaintiffs' attempt to distinguish the decision in *Pauk* is unpersuasive. Essentially, *Pauk* held that a claim based on a university committee's decision to deny a professor tenure accrued when the plaintiff professor was notified of the denial and advised of his termination date. Because the university president had indicated to the plaintiff that he would entertain an appeal of the original decision, it was notification after the appeal had been denied that was controlling, i.e., a final decision. Here, plaintiffs argue that because the Olympics were always contingent and subject to cancella-

tion, notification that their motels were to be taken could not constitute a final decision and the claim could therefore not accrue until the Games actually were held. While the Games may well have been subject to cancellation, the decision to "take" plaintiffs' motels was in every sense final, since it was not subject to further review. Under *Pauk,* therefore, plaintiffs' claims must be found to have accrued at the time when plaintiffs knew they were to be subjected to the regulatory scheme, no later than the spring of 1979.

complained about the proposed acquisition of Tirolerland and Swissaire. In his television interview, he made reference to the fact that he thought this was supposed to be a free country and that he had escaped from Europe to avoid the kind of government action which could dictate the price he could charge for his rooms.

7. Furthermore, I am aware that it had been my parents' intention to rent the facilities at Tirolerland and Swissaire for substantially more than the amount ultimately determined and paid for these rooms. We knew that rooms were in tremendous demand. In addition it had been their intention to sell all rooms with a meal plan for persons occupying the rooms. The acquisition of the rooms prevented us from doing so.

8. I personally received a number of calls at the motel during the period prior to the Olympics from people seeking rooms. I had to tell callers that we were not going to be allowed to rent rooms during the Olympic period.

Scsigulinsky affidavit, ¶¶ 5–8; *see also* plaintiffs' answer to defendants' interrogatory 11. The deposition testimony of Thomas Barry, General Manager of the Tirolerland Motel, is much to the same effect. First, the Barry deposition confirms the fact that the late Mr. Scsigulinsky was aware that his motel had been "taken" sometime in 1979. Barry deposition at 52 ("the first time I checked with Frank about what should I do, he said that you can't do anything but tell them they took our rooms and we discussed this and he said, 'this is the way it is. Anybody who wanted to make reservations we have to tell them that the State has taken them over.' "). The deposition also highlights Mr. Scsigulinsky's vehement protests to the news media regarding the statute. *Id.* at 60. Moreover, the testimony reveals that in April of 1979, after having been informed of the maximum rates he would be permitted to charge, Mr. Scsigulinsky knew that this would affect his earlier hopes of renting at $100.00 a night. *Id.* at 77; *see also id.* at 86.

Finally, plaintiffs' amended complaint itself notes that defendants' actions "required that the plaintiffs rent all the motel rooms operated by them, solely to persons selected by the defendants and at rates determined solely by the defendants substantially lower than rates which market conditions would otherwise dictate, without the consent *and over the objection of the plaintiffs ....*" Amended complaint, ¶ 39 (emphasis added).

Plaintiffs will not now be heard to complain that they did not know they would be damaged by defendants' actions. Plaintiffs' pre-Olympic remonstrations, as summarized in the Scsigulinsky affidavit, make clear that they knew that the regulatory scheme would impose substantial restraints on their ability to charge free-market rates. Indeed, plaintiffs' answer to defendants' interrogatory 10 noted that plaintiffs "anticipated charging $100.00 per night per room and reasonably expected that because of the shortage of rooms available for spectators of the 1980 Winter Olympic Games that market conditions would dictate that such rates would have easily been sustainable." Notwithstanding their anticipated windfall, plaintiffs signed various agreements in April of 1979, *see* defendants' exhibits P–2, P–3 & P–4, committing themselves to rental rates of $60.00 a night for each guest room. There is no question, therefore, that plaintiffs were aware in April of 1979 that they would not realize the rates they had hoped to charge. *See* Barry deposition at 77, 86.

Plaintiffs also point to the fact that it was not until February of 1980 that they learned their rooms would only be occupied on a double occupancy basis instead of their hoped for policy of four guests in a room. The agreements signed in April of 1979 belie this claim as well. Those documents leave no question that the parties contemplated two guests to a room. *See* defendants' exhibits P–2, P–3 & P–4. The only item of which plaintiffs could not have been aware prior to February of 1980 was the underutilization which was to be suffered by their restaurant. Because, as a

matter of law, that consequence did not amount to an unconstitutional taking, it is irrelevant for statute of limitations purposes.

On balance, because the factual record demonstrates plaintiffs' awareness prior to February of 1980 of the detriment they now claim to have suffered as a result of defendants' regulation, the conclusion is inescapable that plaintiffs' claims are time-barred. Plaintiffs were not entitled to await the final damage tally before recognizing their injury. Because plaintiffs knew or had reason to know in early 1979 that they would be damaged by defendants' actions, the cause of action accrued at that point and plaintiffs simply are unjustified in relying on a later accrual point.

Similarly, plaintiffs' argument that the law does not recognize a taking until an actual physical invasion occurs is likewise unpersuasive. Relying on the oft cited New York Court of Appeals decision in *City of Buffalo v. J.W. Clement Co.,* 28 N.Y.2d 241, 321 N.Y.S.2d 345, 269 N.E.2d 895 (1971), plaintiffs argue that it is "well settled that a mere expression of an intent to take, or an announcement of an impending condemnation, is not the point at which the cause of action accrues." Plaintiffs' Memorandum of Law at 7. Plaintiffs argue that defendants' notices of intent to acquire therefore did not mark the accrual of their present claim, but those claims could only have accrued in February of 1980 when their rooms were physically occupied.

Plaintiffs' omissive reading of *Buffalo v. Clement,* however, limits the usefulness of that decision. First, this Court does not disagree with a basic premise of the decision that a mere announcement of an impending taking does not mark the accrual of such a claim. *See also Kirby Forest Industries, Inc. v. United States,* —— U.S. ——, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984) (date of taking in "straight condemnation"

proceeding, 40 U.S.C. § 257, is date on which United States tenders payment to landowner).[20] In large part, the reasoning underlying that decision rested on public policy considerations:

> To hold the date of the *announcement* of the impending condemnation, whether directly to the condemnee or by the news media, constitutes a *de facto* taking at that time, would be to impose an "oppressive" and "unwarranted" burden upon the condemning authority. At the very least, it would serve to penalize the condemnor for providing appropriate advance notice to a property owner. And to so impede the actions of the municipality in preparing and publicizing plans for the good of the community, would be to encourage a converse policy of secrecy which "would but raise [greater] havoc with an owner's rights."

28 N.Y.2d at 256, 321 N.Y.S.2d at 358, 269 N.E.2d at 904 (quoting *City of Buffalo v. J.W. Clement Co.,* 34 A.D.2d 24, 39, 311 N.Y.S.2d 98, 114 (4th Dep't 1970) (Gabrielli, J., dissenting)) (emphasis in original).

Contrary to plaintiffs' suggestion, however, the decision does not foreclose accrual of a claim for a taking prior to some physical occupation. In a thorough discussion of the takings concept, the court took pains to detail its recognition of the concept of de facto takings as opposed to more traditional physical takings. The court noted that whenever a law "deprives the owner of the beneficial use and free enjoyment of his property, or imposes restraints upon such use and enjoyment that materially affect its value, it deprives him of his property within the meaning of the Constitution." 28 N.Y.2d at 253, 321 N.Y.S.2d at 355, 269 N.E.2d at 902. It concluded, however, that a de facto taking could be found only in "situations involving a direct invasion of the condemnee's property *or a direct legal restraint on its use." Id.,* 321 N.Y.S.2d at 356, 269 N.E.2d at 902 (emphasis added). Plaintiffs are simply incorrect

---

**20.** It should nonetheless be borne in mind that both *Buffalo v. Clement* and *Kirby* were not cases involving the accrual of a claim for statute of limitations purposes. The decisions dealt rather with the point at which a taking was deemed to occur for purposes of fixing a level of just compensation.

in their reading of *Buffalo v. Clement* to support the proposition that a taking can never occur prior to physical invasion. The court specifically held:

Again, although we have not yet arrived at a point where an expression of an intent to appropriate, absent some act on the part of the condemning authority toward executing the appropriation (for example, taking possession or exercising some form of control over the use or enjoyment of the property), that is not to say that interferences short of physical invasion of the condemnee's property may not be sufficient to constitute a taking, as it has long been settled that a *de facto* taking does occur where the property has been the subject of some direct legal restraint on its use (*supra*). As noted above, direct legal restraint has traditionally embraced only laws which by their own force and effect, deprive owners of property or materially affect its beneficial use and free enjoyment. While there is authority supportive of the proposition that in the absence of such a law *de facto* taking does not occur without either actual physical invasion or ouster of possession, the idea that there can be a *de facto* taking in the absence of a physical invasion or direct legal restraint is not without current support and finds some viability in the decisions of sister States and the broader pronouncements of other courts.

*Id.* at 256–57, 321 N.Y.S.2d at 358, 269 N.E.2d at 904–05 (citations omitted).

In the present case, there was the "direct legal restraint" which marked the accrual of the alleged taking. In 1979, plaintiffs entered into various agreements to rent their rooms pursuant to the challenged regulatory scheme. There was present therefore, more than a mere announcement of an intent to take; both parties became legally bound by the substance of the 1979 agreements.[21] Precisely because those agreements served to encumber plaintiffs' property, there is no question that a direct legal restraint had been imposed giving rise to the claims which underlie this action. Indeed, plaintiffs acknowledged prior to February of 1980 the scope of such restraint. The affidavit of Frank Scsigulinsky noted that he "personally received a number of calls at the motel during the period prior to the Olympics from people seeking rooms[ ] [and he] had to tell callers that we were not going to be allowed to rent rooms during the Olympic period." Scsigulinsky affidavit, ¶ 8. Because plaintiffs had contracted for the rental of their rooms with defendants, thereby binding both parties to the terms of the contract, a direct legal restraint had been imposed and any claim for a taking had therefore accrued. Because the present suit was commenced more than three years later, those claims are now time-barred.[22]

**21.** The Barry deposition confirms that Mr. Scsigulinsky knew he was limited by the agreements he signed. *See, e.g.,* Barry deposition at 52 ("This is the way it is. Anybody who wanted to make reservations, we have to tell them that the State has taken them over").

**22.** The recent Supreme Court decision in *Kirby Forest Industries v. United States*, — U.S. —, 104 S.Ct. 2187, 81 L.Ed.2d 1 (1984), is not to the contrary, and indeed, suggests the intractable dilemma which faces these plaintiffs. In short, *Kirby* established that absent a "thoroughgoing abrogation of the owner's rights," — U.S. at —, 104 S.Ct. at 2196, a taking could not be found prior to tender by the government of the condemnation award. Because the Court concluded that the property owner's beneficial interests had not been so substantially impaired prior to that time, the compensation award properly should have excluded interest pay-

ments dating back to commencement of the condemnation proceeding. Here, if plaintiffs were to be successful in establishing that a taking had occurred because of a "radical curtailment of [their] freedom to make use of or ability to derive income from [their] land," — U.S. at —, 104 S.Ct. at 2196, any such claim would necessarily be barred by the statute of limitations. Because the "radical curtailment" is conceded by plaintiffs to have manifested itself prior to February of 1980, *see, e.g., supra* note 21, and because nothing happened after that date to effect any further impairment, *Kirby* impels the conclusion that a taking claim would be time-barred. If, on the other hand, the interference with plaintiffs' property was not so severe, then no taking may be found to exist. The critical fact is that plaintiffs' rights were constitutionally affected, if at all, only by actions taken prior to February of 1980. All events subsequent to that date were simply the

Finally, it is equally clear that plaintiffs' remaining constitutional challenges are time-barred as well. The unmistakable conclusion to be drawn from the testimony and affidavits submitted by plaintiffs themselves is that long before February of 1980, they were well aware of the nature and perceived deleterious effects of defendants' actions. In short, notwithstanding their deep resentment toward and strong objections to the now challenged scheme, plaintiffs elected to defer any formal legal action until January of 1983. Because they knew or had reason to know as early as the spring of 1979 of the injuries which underlie the present suit, the constitutional claims are untimely. While plaintiffs well may not have been aware of the extent of the damages they ultimately claimed to have suffered until after the Olympics, the evidence makes clear, at the very least, that they were aware that some damages would obtain. For example, plaintiffs knew in early 1979 that they would be permitted to rent only at rates far below their hoped-for $100.00 a night. *See* Barry deposition at 77, 86. Indeed, in 1979, plaintiffs were provided with copies of the schedules used to determine maximum rates. *See, e.g., id.* at 83–85; plaintiffs' exhibit J–64. The constitutional deprivations of which plaintiffs now complain necessarily occurred prior to the Olympics, during the period in which they were forced to begin compliance with the statute in anticipation of the approaching Games. Anything occurring after February 1, 1980 was therefore only an "inevitable consequence" of what had gone before.

## V

The Court reiterates its strongly held conclusion that the facts underlying the instant complaint give rise in no conceivable fashion to any unconstitutional taking. Simply by limiting the potentially exorbitant rates plaintiffs dreamed of exacting from those attending the Games, defendants did not engage in any constitutionally proscribed conduct. While plaintiffs may

have profited less than they would have liked as a result of defendants' actions, the fact that plaintiffs' expectancies were not realized does not transform defendants' actions into a taking. If plaintiffs can be said to have suffered at all, it was at most to an insubstantial degree and for but a brief period. Plaintiffs' motel property remained intact throughout the alleged taking and all incidents of ownership remained in large part unaffected. All plaintiffs were deprived of for the three week period was the self-claimed right of profiteering at the expense of Olympic visitors. There is simply no question that the effect of defendants' actions was not to deprive plaintiffs of so substantial an aspect of their property as to result in an unconstitutional taking.

With respect to plaintiffs' uncommendable attempt to insert heretofore unpleaded claims of denial of due process and equal protection, suffice it to note that those claims were better left unannounced. Similarly, plaintiffs' tardy state law claims are not an appropriate subject of this Court's attention in light of the disposition of the federal claims.

Finally, even were the Court to perceive some merit to the asserted constitutional claims, any such claims would be barred by the three-year statute of limitations and therefore would not be maintainable.

On balance, it is clear beyond doubt that no factual questions exist which would warrant denial of the instant motions. The essential facts which are not subject to dispute impel the conclusion not only that no compensable taking has been effected but that the contemporary cynicism surrounding the once pristine Olympic Games is perhaps justified. Accordingly, defendants' motions for summary judgment are granted in their entirety.

It is so Ordered.

natural consequence of the restrictions that had

been imposed earlier.